UNION PACIFIC RAILROAD COMPANY *v*. UNITED STATES.

1. The act entitled "An Act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes," approved July 1, 1862 (12 Stat. 489), after providing for the issue of patents ·for land and of bonds to the Union Pacific Railroad Company and other companies from time to time, as successive sections of their respective roads should be completed, requires the companies to perform all government transportation of mails, troops, &c., and to credit the compensation therefor on the government loan; and then adds, that "after said road is completed, until said bonds and interest are paid, at least five per centum of the net earnings of said road shall also be annually applied to the payment thereof." *Held*, 1. That the liability of the Union Pacific Railroad Company to make this payment accrued when it reported, and the President of the United States accepted, its road as completed, for the purpose of issuing the bonds, though the acceptance was provisional, and security was required that all deficiencies in construction should be supplied. 2. That the company having obtained the bonds and agreed in regard to the security, is estopped from denying that the road was then completed.
2. The "earnings" of the road include all the receipts arising from the company's operations as a railroad company, but not those from the public lands granted, nor fictitious receipts for the transportation of its own property. "Net earnings," within the meaning of the law, are ascertained by deducting from the gross earnings all the ordinary expenses of organization and of operating the road, and expenditures made *bona fide* in improvements, and paid out of earnings, and not by the issue of bonds or stock; but not deducting interest paid on any of the bonded debt of the company.
3. The government bonds issued to the company were declared to be a first lien on the road and property; the act of July 2, 1864 (13 id. 356), authorized the company to issue an equal amount of first-mortgage bonds, to have priority over the government bonds. *Held*, that this priority authorized the payment of the interest accruing ·on these first-mortgage bonds out of the net earnings of the road, in preference to the five per centum payable to the government, which is only demandable out of the excess in each year.

APPEAL from the Court of Claims.

This is a suit by the Union Pacific Railroad Company to recover compensation for services rendered to the United States prior to 1874, and during a portion of that year 1874, and the whole of the year 1875. A counter-claim is set up for five per cent of the net earnings of the company, under the provision of the sixth section of the act of July 1, 1862 (12 Stat. 489), that "after the said road is completed, until said bonds and interest are paid, at least five per centum of the net earn-

ings of said road shall also be annually applied to the payment thereof." The United States alleges that the road was completed on the 6th of November, 1869, and that since that time a large amount of net earnings has been realized by the company, which it has failed to pay or apply to the said bonds. The company denies this, and alleges that its road was not finished until Oct. 1, 1874, and that it has not realized any net earnings in any year, since either the 6th of November, 1869, or the 1st of October, 1874 ; and denies that it was its duty to pay to the United States annually any money whatever, as and for five per cent upon its net earnings, to be applied in the manner aforesaid.

The Court of Claims decided that the road was completed on the 6th of November, 1869, and that the company did, after that period, annually realize net earnings to a large amount, for the six years from Nov. 6, 1869, to Nov. 6, 1875, amounting in the aggregate to the sum of $28,052,045.67 ; and that five per cent thereof, to wit, the sum of $1,402,602.28, was payable to the government ; whilst one-half of the compensation due for the services rendered by the company to the government, for the period covered by the petition, amounted to only $593,627.10 ; and, therefore, that the government was entitled to recover from the company the difference between these two sums, amounting to the sum of $808,975.18. From this judgment the company appealed.

So much of the eighteenth finding by the Court of Claims as is referred to and commented on in the opinion of the court is as follows : —

A. — EARNINGS.

|  | Nov. 6, 1869, to Nov. 5, 1870. | Nov. 6, 1870, to Nov. 5, 1871. | Nov. 6, 1871, to Nov. 5, 1872. | Nov. 6, 1872, to Nov. 5, 1873. | Nov. 6, 1873, to Nov. 5, 1874. | Nov. 6, 1874, to Nov. 5, 1875. |
|---|---|---|---|---|---|---|
| 7. Company freight earnings . . . . . . | $482,387.43 | $362,414 56 | $403,591.90 | $465,734.02 | $506,698.53 | $657,641.92 |
| 12. Miscellaneous . . . . | 116,300.14 | 94,610.20 | 112,920.09 | 140,039.31 | 218,942.15 | 166,696.94 |

## B. — EXPENDITURES.

| | Nov. 6, 1869, to Nov. 5, 1870. | Nov. 6, 1870, to Nov. 5, 1871. | Nov. 6, 1871, to Nov. 5, 1872. | Nov. 6, 1872, to Nov. 5, 1873. | Nov. 6, 1873, to Nov. 5, 1874. | Nov. 6, 1874, to Nov. 5, 1875. |
|---|---|---|---|---|---|---|
| 1. Conducting transportation expenses | $829,771.15 | $671,194.53 | $746,950.28 | $759,426.61 | $760,646 38 | $917,250.86 |
| 2. Motive-power expenses | 1,778,601.44 | 1,229,048.51 | 1,681,610.17 | 1,754,271.78 | 1,585,962.21 | 1,811,629.48 |
| 3. Maintenance of cars expenses | 608,622.90 | 302,225.09 | 367,584.14 | 436,332.64 | 429,562.89 | 567,566.25 |
| 4. Maintenance of way expenses | 1,403,090.28 | 995,683.49 | 1,551,999.92 | 1,700,434.97 | 1,700,481.14 | 1,910,420.20 |
| 5. General expenses (including taxes) | 445,119.88 | 397,651.07 | 353,556.19 | 363,976.69 | 405,813 19 | 446,519.10 |
| 6. Ferry expenses | 54,714.88 | . . . . . . | . . . . . . | . . . . . . | . . . . . . | . . . . . . |
| 7. Deficiency in fuel and material account | 75,577.54 | . . . . . . | . . . . . . | . . . . . . | . . . . . . | . . . . . . |
| 8. Legal expenses | 85,508 81 | 48,807.41 | 57,698.94 | 12,852.55 | 25,246.43 | 53,016.88 |
| 9. United States revenue stamps | 6,639.32 | 926.02 | 1,866.72 | 326 85 | . . . . . . | . . . . . . |
| 10. Salary account | 16,355.90 | 53,522.39 | 28,725.86 | 24,886 69 | 54,218.18 | 32,750.83 |
| 11. Government directors | 3,655.30 | 3,115.00 | 6,047.00 | 4,561.00 | 3,301.75 | 4,180.45 |
| 12. Government commissioners | 2,391.15 | . . . . . . | . . . . . . | . . . . . . | . . . . . . | 722.40 |
| 13. Expense account | 26,057.18 | 24,241.41 | 12,194.07 | 21,237.90 | 26,873.24 | 17,971.73 |
| 14. Telegraph earnings refunded | . . . . . . | . . . . . . | 3,294.23 | . . . . . . | . . . . . . | . . . . . . |
| 15. Omaha bridge, expenses of operating | . . . . . . | . . . . . . | 89,621.97 | 247,680.10 | 201,814.87 | 234,683.12 |
| 16. Car-service | . . . . . . | . . . . . . | . . . . . . | . . . . . . | 21,780.78 | . . . . . . |
| 17. Discount and interest on floating debt | 409,668.66 | 188,136.73 | 142,267.54 | 340,506.40 | 308,765.60 | 61,545.17 |
| 18. Expenses of land and town-lot departments | 41,524.47 | 60,824.89 | 87,795.12 | 89,768.58 | 104,888.00 | 141,482.34 |
| 19. Taxes on lands and town lots | 35,778.90 | 85,105.49 | 88,610.97 | 1,086.88 | 1,262.64 | 169,773.68 |
| 20. Interest on first-mortgage bonds | 2,015,326.28 | 1,715,200.96 | 1,657,386.75 | 1,633,020.00 | 1,633,410.00 | 1,634,100.00 |
| 21. Interest on land-grant bonds | 553,947.91 | 601,647.34 | 641,209.01 | 585,061.53 | 576,765.00 | 546,175.00 |
| 22. Interest on income bonds | 673,238.41 | 882,306.95 | 935,550.00 | 935,641.06 | 778,348.00 | 450.0? |
| 23. Interest on sinking-fund bonds | . . . . . . | . . . . . . | . . . . . . | . . . . . . | 157,912.00 | 1,021,388.88 |
| 24. Interest on Omaha bridge bonds | . . . . . . | . . . . . . | 98,480.00 | 196,957.24 | 194,841.01 | 190,278 38 |
| 25. Premium on gold to pay coupons | . . . . . . | 117,569.84 | 149,278.18 | 264,963.27 | 235,971.97 | 301,786.53 |
| 26. Construction of Omaha bridge | . . . . . . | . . . . . . | . . . . . . | 24,334.25 | 4,390.00 | . . . . . . |
| 27. Expenditures for station buildings, shops, and fixtures, &c., as per statement attached | 896,977.03 | 66,849.73 | 497,875.85 | 155,739.72 | 177,124.57 | 2,810.17 |
| 28. Requirements of sinking-funds for the redemption of funded debts: | | | | | | |
|    Omaha bridge bonds | . . . . . . | . . . . . . | 38,000.00 | 41,000.00 | 44,000.00 | 47,000.00 |
|    Sinking-fund mortgage bonds | . . . . . . | . . . . . . | . . . . . . | . . . . . . | . . . . . . | 144,000.00 |
| 29. Premium on Omaha bridge bonds redeemed | . . . . . . | . . . . . . | . . . . . . | 12,218.00 | 10,752.50 | 12,513.32 |
| 30. United States interest half transportation accounts charged during the year | 324,697.40 | 527,799.06 | 335,181.24 | 362,569.93 | 364,971.73 | 358,193.39 |
| Total | $10,287,954.25 | $7,942,755.88 | $9,572,784.15 | $9,968,854.70 | $9,809,105 08 | $10,628,208.16 |

DETAIL OF EXPENDITURES FOR STATION BUILDINGS, &c., CONSTITUTING ITEM 27 ABOVE.

| | Nov. 6, 1869, to Nov. 5, 1870. | Nov. 6, 1870, to Nov. 5, 1871. | Nov. 6, 1871, to Nov. 5, 1872. | Nov. 6, 1872, to Nov. 5, 1873. | Nov. 6, 1873, to Nov. 5, 1874. | Nov. 6, 1874, to Nov. 5, 1875. |
|---|---|---|---|---|---|---|
| 1. Station buildings | $249,384.74 | $48,286.40 | $119,795.14 | $14,580.81 | . . . . . . | . . . . . . |
| 2. Shops and fixtures | 40,618.27 | 94,855.51 | 106,067.83 | 2,744.02 | $1,718.32 | . . . . . . |
| 3. Equipment | 109,933.18 | . . . . . . | 47,598.03 | 8,380.72 | 93,213.18 | . . . . . . |
| 4. Government commissioners | 91.80 | . . . . . . | . . . . . . | . . . . . . | . . . . . . | . . . . . . |
| 5. Fencing | 72,763.20 | 956.50 | 595.44 | . . . . . . | . . . . . . | . . . . . . |
| 6. Snow sheds and fences | 200,147.90 | 5,787.67 | 116,770.54 | 66,969.23 | . . . . . . | . . . . . . |
| 7. Express outfit | 7,136.41 | . . . . . . | . . . . . . | . . . . . . | . . . . . . | $2,810.17 |
| 8. Engineering | 13,880.90 | 11,599.75 | 8,247.98 | 102.87 | . . . . . . | . . . . . . |
| 9. Bridging | 124,047.59 | . . . . . . | . . . . . . | 11,480.85 | . . . . . . | . . . . . . |
| 10. Car shops and sheds | 12,938.08 | 6,661.86 | 23,234.63 | 1,020.26 | . . . . . . | . . . . . . |
| 11. Roadway and track | 64,426.30 | . . . . . . | 31,885.19 | 16,550.09 | . . . . . . | . . . . . . |
| 12. Hotels | 1,548.66 | . . . . . . | . . . . . . | . . . . . . | . . . . . . | . . . . . . |
| 13. Tenements | . . . . . . | 15,759.26 | 40,775.37 | 403.60 | . . . . . . | . . . . . . |
| 14. Coal-sheds | . . . . . . | . . . . . . | 2,905.70 | 11,006.63 | . . . . . . | . . . . . . |
| 15. Omaha depot buildings | . . . . . . | . . . . . . | . . . . . . | 7,821.07 | 37,255.16 | . . . . . . |
| 16. Omaha general offices | . . . . . . | . . . . . . | . . . . . . | 14,977.95 | 6,896.46 | . . . . . . |
| 17. Real estate | . . . . . . | . . . . . . | . . . . . . | . . . . . . | 12,525.00 | . . . . . . |
| 18. Laramie rolling-mill | . . . . . . | . . . . . . | . . . . . . | . . . . . . | 16,550.33 | . . . . . . |
| 19. Water-works | . . . . . . | . . . . . . | . . . . . . | . . . . . . | 8,906.12 | . . . . . . |
| | $896,977.03 | $183,906.95 | $497,875.85 | $156,038.10 | $177,124.57 | $2,810.17 |
| **LESS RECEIPTS AND EXPENDITURES.** | | | | | | |
| 20. Equipment | . . . . . . | 111,430.40 | . . . . . . | . . . . . . | . . . . . . | . . . . . . |
| 21. Fencing | . . . . . . | . . . . . . | . . . . . . | 298 38 | . . . . . . | . . . . . . |
| 22. Roadway and track | . . . . . . | 5,626.82 | . . . . . . | . . . . . . | . . . . . . | . . . . . . |
| | . . . . . . | $117,057.22 | . . . . . . | $298.38 | . . . . . . | . . . . . . |
| Totals of item No. 27 | $896,977.03 | $66,849.73 | $497,875.85 | $155,739.72 | $177,124.57 | $2,810.17 |

Items 5, 6, 7, 8, 9, 10, 11, 12, 14, and 15 are not in dispute.

Item 1, "conducting transportation expenses," is liable to be reduced by the amounts shown in line 1 of the table below as expended for "tenement-houses and hotels," and by the amounts shown in line 2 as expended for new station-buildings; item 2, "motive-power expenses," is liable to be reduced by the amounts shown in line 3 as expended for "engine-equipment," and by the amounts shown in line 4 as expended for "tanks and water-works;" item 3, "maintenance of cars expenses," is liable to be reduced by the amounts shown in line 5 as expended for "car-equipment;" and item 4, "maintenance of way expenses," is liable to be reduced by the amounts shown in line 6 as expended for the "Laramie rolling-mills," in case such several and respective outlays are regarded as not

proper to be deducted from "gross earnings" in order to arrive at "net earnings."

| | Nov. 6, 1872, to Nov. 5, 1873. | Nov. 6, 1873, to Nov. 5, 1874. | Nov. 6, 1874, to Nov. 5, 1875. |
|---|---|---|---|
| 1. Tenement-houses and hotels . . | . . . . . . | $1,659.96 | $21,229.53 |
| 2. New station-buildings . . . . | $6,909.98 | 18,146.77 | 78,589.57 |
| 3. Engine-equipment . . . . . . | . . . . . . | 25.398.69 | 63,277.70 |
| 4. Tanks and water-works . . . . | . . . . . . | 734.99 | 12,450.13 |
| 5. Car equipment . . . . . . . | . . . . . . | 3,600.00 | 206,930.36 |
| 6. Laramie rolling-mills . . . . . | . . . . . . | 43,716.01 | 149,859.30 |

Item 13, "expense account," is subject to be reduced by the following amounts in case such outlays are regarded as not proper to be deducted from "gross earnings" in order to arrive at "net earnings;" viz., In the year, Nov. 6, 1869, to Nov. 5, 1870, expenses relating to an issue of bonds, $10,339.76; March 13, 1871, cost of a plate for the bridge bonds, $1,500; June 5, 1874, and expense relating to the issue of sinking-fund bonds, $6,579.10.

The disputed expenditures in items 1, 2, 3, and 4 were for new construction. Item 27 was also for new construction.

Item 16 was for the use of the cars of other companies.

Items 17, 20, 21, 22, 23, 24, and 25 show payments of interest on debts.

Items 18 and 19 show payments made on account of the land department of the company's business.

Item 26 shows payments in the construction of the Omaha bridge above the amounts received from the sale of the mortgage bonds secured by it.

Items 28 and 29 show expenditures made for a sinking-fund for the redemption of the company's debt.

Item 30 shows an assumed payment of a portion of the interest on the government subsidy bonds by the application to it of half the government transportation account.

*Mr. Sidney Bartlett* for the appellant.

*The Attorney-General* and *Mr. Joseph K. McCammon, contra.*

MR. JUSTICE BRADLEY, after stating the case, delivered the opinion of the court.

This case is in some respects supplemental to that of *United*

*States* v. *Union Pacific Railroad Co.*, 91 U. S. 72.   That was a suit brought in the Court of Claims, by the company, to recover one-half of the compensation due to it for services rendered to the government between the dates of February, 1871, and February, 1874, against which claim the United States set up a counter-claim for the interest which it had paid on the subsidy bonds advanced to the company.   This court held that, by the terms of the acts of Congress granting said subsidies, the company was not required to pay the interest on said bonds until the maturity of the principal thereof; and therefore the counter-claim of the government was overruled.   The present case arises upon a like suit brought by the company in the Court of Claims for the recovery of one-half of the compensation due to it for services rendered to the government during the remainder of the year 1874 and the whole of the year 1875, including certain services performed prior to 1874, not included in the first suit.

The general history of the legislation of Congress in reference to the Union Pacific Railroad Company and the associated enterprises, and of the policy of the government respecting the same, is fully stated in our opinion in the former case, and need not be repeated here.   We shall only advert to the several acts, and to the proceedings and negotiations which have taken place between the parties, so far as may be necessary to an understanding of the specific questions which are raised in this suit. The facts are fully set forth by the Court of Claims in its findings.   Three principal questions are raised by the acts of Congress and the facts found by the court, which it is necessary for us to determine.

*First*, When was the road completed?

*Secondly*, What is included in net earnings?

*Thirdly*, How and under what conditions are they to be paid?

I.  First, as to the completion of the road.

In one sense, a railroad is never completed.   There is never, or hardly ever, a time when something more cannot be done, and is not done, to render the most perfect road more complete than it was before.   This fact is well exemplified by the history of the early railroads of the country.   At first, many of them were constructed with a flat rail, or iron bar, laid on wooden

string-pieces, resulting in what was known, in former times, as snake-heads — the bars becoming loose, and curving up in such a manner as to be caught by the cars, and forced through the floors amongst the passengers. Then came the T rail; and finally the H rail, which itself passed through many successive improvements. Finally, steel rails in the place of iron rails have been adopted as the most perfect, durable, safe, and economical rails on extensive lines of road. Bridges were first made of wood, then of stone, then of stone and iron. Grades originally crossed, and, in most cases, do still cross, highways and other roads on the same level. The most improved plan is to have them, by means of bridges, pass over, or under, intersecting roads. A single track is all that is deemed necessary to begin with; but now, no railroad of any pretensions is considered perfect until it has at least a double track. Depots and station-houses are at first mere sheds, which are deemed sufficient to answer the purpose of business. These are succeeded, as the means of the company admit, by commodious station and freight houses, of permanent and ornamental structure. And so the process of improvement goes on; so that it is often a nice question to determine what is meant by a complete, first-class railroad; and if a question of right or obligation between parties depends upon the completion of such a structure, courts are obliged to spell out, from the circumstances of the case, and the language and acts of the parties, what they mean when they use such terms.

In the present case, we have for our guidance several clauses in the charter of the Union Pacific Railroad Company (the act of 1862), in which the terms referred to are used, as well as the acts of the parties in reference thereto. One of these clauses is in the fourth section of the act, which contains an engagement on the part of the government to grant certain sections of land to the company on the completion of a certain number of miles of its road. The third section having granted to the company every alternate section of the public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of the railroad, on the line thereof, and within the limits of ten miles, not otherwise disposed of by the United States, the fourth section proceeds as follows: —

" SECT. 4. That whenever said company shall have, completed forty consecutive miles of any portion of said railroad and telegraph line, ready for the service contemplated by this act, and supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering-places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, the rails and all the other iron used in the construction and equipment of said road to be American manufacture of the best quality, the President of the United States shall appoint three commissioners to examine the same and report to him in relation thereto; and if it shall appear to him that forty consecutive miles of said railroad and telegraph line have been completed and equipped in all respects as required by this act, then, upon certificate of said commissioners to that effect, patents shall issue conveying the right and title to said lands to said company, on each side of the road as far as the same is completed, to the amount aforesaid; and patents shall in like manner issue as each forty miles of said railroad and telegraph line are completed, upon certificate of said commissioners. . . . *Provided, however*, that no such commissioners shall be appointed by the President of the United States unless there shall be presented to him a statement, verified on oath by the president of said company, that such forty miles have been completed in the manner required by this act, and setting forth with certainty the points where such forty miles begin and where the same end, which oath shall be taken before a judge of a court of record."

By the act of 1864 (13 Stat. 356), the amount and extent of the grant is doubled.

Again, by the fifth section of the act of 1862 it is enacted as follows : —

" SECT. 5. That, for the purposes herein mentioned, the Secretary of the Treasury shall, upon the certificate in writing of said commissioners of the completion and equipment of forty consecutive miles of said railroad and telegraph, in accordance with the provisions of this act, issue to said company bonds of the United States of $1,000 each, payable in thirty years after date, bearing six per centum per annum interest, . . . to the amount of sixteen of said bonds per mile for each section of forty miles, and to secure the repayment to the United States, as hereinafter provided, of the amount of said bonds so issued and delivered to said company, together with all interest thereon which shall have been paid by the United States,

the issue of said bonds and delivery to the company shall *ipso facto* constitute a first mortgage on the whole line of the railroad and telegraph, together with the rolling-stock, fixtures, and property of every kind and description, and in consideration of which said bonds may be issued."

By the eleventh section the amount of bonds granted was to be $48,000 per mile for one hundred and fifty miles through the Rocky Mountains, and for the same distance including the Sierra Nevada Mountains, and $32,000 per mile between those points; and by the act of 1864 the completed sections were reduced to twenty miles instead of forty.

By the sixth section of the act it is further enacted as follows: —

"Sect. 6. That the grants aforesaid are made upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit despatches over said telegraph line, and transport mails, troops and munitions of war, supplies and public stores, upon said railroad for the government whenever required to do so by any department thereof, and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service), and all compensation for services rendered for the government shall be applied to the payment of said bonds and interest until the whole amount is fully paid. Said company may also pay the United States, wholly or in part, in the same or other bonds, treasury notes, or other evidences of debt against the United States, to be allowed at par, *and after said road is completed, until said bonds and interest are paid, at least five per centum of the net earnings of said road shall also be annually applied to the payment thereof.*"

Reading these sections together, it seems hardly possible to conceive that the word "completed," in the last clause of the sixth section, has any other or different meaning from that which it has in the fourth and fifth sections; or that the five per cent of the net earnings should not be demandable by the government as soon as the whole line was completed in the same manner in which any forty [or twenty] miles was to be completed in order to entitle the company to bonds. This con-

clusion is so obvious and self-evident that it hardly needs a word of argument to maintain it.

Now, the findings of fact show that the company began to claim the subsidy of lands and bonds for completed sections of the railroad and telegraph line in June, 1866 ; and from that time forward made similar successive applications nearly or quite every month, tendering the affidavit of the president of the company as to the completion of the several sections, as required by the act.  The first of these affidavits was made on the 25th of June, 1866, and was in the words following : —

" John A. Dix, being duly sworn, deposeth and saith, that he is president of the Union Pacific Railroad Company, and in pursuance of the requirements of sect. 4 of the act of Congress approved July 1, 1862, entitled ' An Act to aid in the construction of the railroad and telegraph line from the Missouri River to the Pacific Ocean,' &c., he now states, under oath, that one hundred and five consecutive miles of said railroad, beginning at Omaha and ending at a point one hundred and five miles westward thereof, on the line designated by the maps of said company on file in the Department of the Interior, have been completed and equipped in all respects as required by the act referred to, as he is informed by the engineer charged with the construction of said line, and as he verily believes to be true ; and he further states, under oath, that one hundred and five miles of telegraph have been completed for the said one hundred and five consecutive miles, as he is also advised by the engineer in charge.

" John A. Dix, *President.*

" Sworn to, June 25, 1866."

The last affidavit, relating to the completion of the last section of the road (and indeed extending some fifty miles beyond the point of division finally agreed upon between the Union and Central Pacific Railroad Companies), was made on the 13th of May, 1869, and was in the words following : —

" Oliver Ames, being duly sworn, deposeth and saith that he is president of the Union Pacific Railroad.  And in pursuance of the requirements of sect. 4 of the act of Congress approved July 1, 1862, entitled ' An Act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean,' &c., he now states, under oath, that another section of eighty-six miles, commencing at 1,000 mile and ending at 1,086 mile-post, was completed on the tenth

day of May, 1869, making in all 1,086 consecutive miles of said road, beginning at the initial point on section 10, opposite western boundary of the State of Iowa, as fixed by the President of the United States, and ending at a point 1,086 miles westward therefrom on the line designated by the maps of said company on file in the Department of the Interior, that have been completed and equipped in all respects as required by the act referred to, as he is informed by the engineer charged with the construction of said line, and as he verily believes to be true. And he further states, under oath, that 1,086 miles of telegraph have been completed for the said 1,086 consecutive miles, as he is also advised by the engineer in charge.

" OLIVER AMES,
" *President Union Pacific Railroad Company.*

   " Sworn to, May 13, 1869."

The Court of Claims finds as a matter of fact that " on the 10th of May, 1869, the last rail of the claimant's road was laid, and about a week afterwards the road was opened over the entire length to public use for the transportation of passengers and freight, and for the service of the government; and this service was from that time forward performed continuously."

It further found that on the 23d of December, 1865, the President of the United States, under the authority of sect. 4 of the said act of July 1, 1862, appointed commissioners to examine and report upon the first section of forty miles of said road ; and some time prior to April 30, 1866, he appointed other commissioners to examine and report upon the second section of twenty-five miles of said road ; and after the making of each of the foregoing affidavits, he appointed other commissioners to examine the sections of the road as successively completed, and report to him in relation thereto. The reports of the commissioners so appointed were made in the first instance to the Secretary of the Interior, who transmitted them to the President, who approved the recommendations of the Secretary of the Interior by writing his approval thereon. The following is the first letter of the said secretary, with the President's indorsement thereon : —

" DEPARTMENT OF THE INTERIOR,
WASHINGTON, D. C., Jan. 24, 1866.

" SIR, — I have the honor to submit herewith enclosed, for your action, the report of the commissioners appointed by you on the 23d

December, 1865, to examine the first section of forty miles of the Union Pacific Railroad, extending west from the city of Omaha, Territory of Nebraska. The company authorized to build this road having, as shown in the report of the commissioners, obligated itself to remedy, within a reasonable time, the deficiencies in the construction of said section, I respectfully recommend that the same be accepted, and proper steps be ordered for the issue of the bonds and land-grants due the company agreeably to law.

"I am, sir, with much respect, your obedient servant,

"JAS. HARLAN, *Secretary.*

"THE PRESIDENT."

"EXECUTIVE MANSION, Jan. 24, 1866.

"The within recommendations of the Secretary of the Interior are approved, and the Secretary of the Treasury and himself are hereby directed to carry the same into effect.

"ANDREW JOHNSON."

Similar reports were made by the Secretary of the Interior, as the successive sections were completed and reported on by the commissioners, down to and including the ninth day of February, 1869, and were severally approved by the President; and the company received the subsidy bonds of the government in accordance therewith.

As it appeared by the reports of some of the commissioners that the several sections of road were not, and could not, under the circumstances be, fully completed up to the ultimate standard of a first-class railroad, though they might be, and actually were, completed, section by section, so as to admit of transportation and travel over the same, the railroad company, on the 12th of February, 1869, being thereto required by the Attorney-General of the United States, as a guaranty for the ultimate full completion and equipment of the road, executed an agreement of the last-mentioned date to deposit in the Treasury Department their own first-mortgage bonds (which by the act of July 2, 1864, they had been authorized to issue, and which were to be preferred to the lien of the United States) to the amount of $3,000,000, to be held by the government as security for the completion of the road according to the provisions of the statutes in that behalf, and until the President, on a proper examination of the same, should be satisfied that it was so com-

pleted.    At the same time, the company also agreed, by way of further security, to leave their land-grants with the government, without taking out patents for the same, until the President should be satisfied as aforesaid, — or *pro tanto* to such extent as he might not be satisfied.

On the 10th of April, 1869, a joint resolution was passed by Congress, by which, amongst other things, it was declared that the common terminus of the Union Pacific and the Central Pacific railroads should be at or near Ogden.    And that the President was thereby authorized to appoint a board of eminent citizens, not exceeding five in number, to examine and report upon the condition of the two roads (the Union Pacific and the Central Pacific), and what sum, if any, would be required to complete each of them.    And the President was further authorized and required to withhold from them an amount of subsidy bonds sufficient to secure the full completion of the roads as first-class roads, or to receive an equal amount of the first-mortgage bonds of the companies.    A board of five eminent citizens was appointed under this resolution in the month of August following.

In the mean time, two additional reports were made by the Secretary of the Interior to the President, one on the 27th of May, 1869, and the other on the 15th of July, 1869, in each case recommending the acceptance of the sections referred to therein, and also recommending the issue of bonds therefor, in accordance with the agreement aforesaid, to the effect that the company should deposit its first-mortgage bonds with the Secretary of the Treasury to such amount as might be deemed necessary to secure the ultimate completion of the road.

The last of these reports, with the President's indorsement thereon, is in the words following, to wit : —

"DEPARTMENT OF THE INTERIOR,
WASHINGTON, D. C., July 15, 1869.

" Sir, — I have the honor to transmit herewith, for your action, five reports, dated the 9th ultimo, of the commissioners, Messrs. Gouverneur K. Warren and James F. Wilson; also the report of Isaac N. Morris, the other commissioner, dated May 28, 1869, appointed by you to examine and report upon a section of $85\frac{88}{100}$ miles of the road and telegraph line, constructed by the Union

Pacific Railroad Company, commencing on the road of said company at the 1,000th mile-post west from Omaha and terminating at the $1,085\frac{88}{100}$ mile-post.

"The majority of said commissioners, in their report, represent the said section of $85\frac{88}{100}$ miles ready for present service, and completed and equipped as a first-class railroad, and that the telegraph line is completed for the same distance; and as the company have paid the per diem and mileage due them under the twenty-first section of the act of Congress approved July 27, 1866, on account of their examination of said section of road and telegraph line, I therefore respectfully recommend the acceptance of the same and the issue of bonds and of patents for land due on account of said section, agreeably to the act approved July 1, 1862, entitled 'An Act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes,' and the acts amendatory thereof. Said bonds and patents to be issued to the Union Pacific Railroad Company on account of the work from said 1,000th mile-post to the 'common terminus of the Union Pacific and Central Pacific Railroads,' 'at or near Ogden;' and the bonds and patents on account of said work from said common terminus to Promontory Summit to be issued to such company as the proper authority, after full investigation of the respective claims of the Union Pacific Railroad Company and the Central Pacific Railroad Company of California shall determine to be thereunto lawfully entitled: *Provided, however,* that no bonds or patents shall in any event be issued until such security shall be deposited with the Secretary of the Treasury necessary to secure the ultimate completion of the road, agreeably to the acts mentioned in my letter to you of the 27th of May last.

"I am, sir, very respectfully, your obedient servant,

"J. D. Cox, *Secretary.*

"THE PRESIDENT."

"EXECUTIVE MANSION, July 15, 1869.

"The within recommendations of the Secretary of the Interior are approved, and the Secretary of the Treasury and himself are hereby directed to carry the same into effect.

"U. S. GRANT."

It is found by the Court of Claims that on the 22d of July, 1869, in partial performance of this last order of the President, $640,000 of subsidy bonds were issued to the company, being

the subsidy for the section of twenty miles extending from the 1,000th to the 1,020th mile from Omaha, the subsidy bonds on all the previous sections having been received by the company before that time.

As before stated, in August, 1869, the President, in accordance with the joint resolution of April 10, 1869, appointed a board of five eminent citizens, to examine and report upon the condition of the road, and what sum would be required to complete it as a first-class railroad. This board made a detailed examination, and on the 30th of October, 1869, made an elaborate report, specifying a number of particular things at various points, such as ballasting, embankment, masonry, trestle-work, &c., which required perfecting to put the road in first-class condition ; estimating the aggregate expense of such improvements on the whole line from Omaha to Ogden at $1,586,100. They conclude their report as follows :. " This great line, the value of which to the country is inestimable, and in which every citizen should feel a pride, has been built in about half the time allowed by Congress, and is now a good and reliable means of communication between Omaha and Sacramento, well equipped, and fully prepared to carry passengers and freight with safety and despatch, comparing in this respect favorably with a majority of the first-class roads in the United States."

This report being made and accepted, on the 3d of November, 1869, the Secretary of the Interior issued directions to the Commissioner of the General Land-Office to commence patenting lands to the companies, and to issue patents for one half of the lands which they were to receive, — the patents for the other half to be suspended until further directions, in addition to the bonds retained, as security for the completion of the roads in the matters reported deficient or not up to the standard by the said committee.

Up to the 6th of November, 1869, the point at which the Union Pacific and Central Pacific roads should meet was not settled ; but assuming that the former would go no further west than Ogden, $1,033\frac{68}{100}$ miles from Omaha, the Secretary of the Treasury on that day ordered that bonds at the rate of $32,000 per mile for the distance of $13\frac{68}{100}$ miles from the

1,020th mile-post to Ogden should be issued, but ordered that the register of the treasury should hold $323,488 thereof as security for the over-issue of first-mortgage bonds by the company, and deliver the balance to it. The reason of withholding these bonds was, that the company, having been authorized by the act of July 2, 1864, supplementary to its charter, to issue the same amount of first-mortgage bonds as it was entitled to receive from the government, and which was accorded a priority over the lien of the government bonds, and having actually constructed the road fifty-three miles west of Ogden, had issued a larger amount of its own bonds than the amount of subsidy to which it was entitled as the point of division between its road and that of the Central Pacific was finally settled. By a subsequent arrangement with the Central Pacific Railroad Company, the point of junction between the two roads was fixed at a point five miles west of Ogden, which entitled the Union Pacific Company to bonds for such five additional miles, amounting to $160,000, which it received in July, 1870, making the total amount of subsidy bonds which it was entitled to, and did receive, the sum of $27,235,760.

It thus appears that prior to the sixth day of November, 1869, the entire road of the company had, in separate sections, been reported by it, under the oath of its president, as being completed and furnished as a first-class railroad, in accordance with the requirements of the act, and that upon the strength of these representations, and the corresponding reports of the commissioners appointed to examine the several sections, it had been accepted by the President; and that the company, with the exception of the last $160,000 of bonds, the claim to which arose from a mutual arrangement between the two companies, had received its entire subsidy f government bonds; and had received an order for the issuing of patents for its grant of public lands to the extent of one half thereof; the patents for the other half being suspended, by virtue of the agreement made in April, 1869, as security for the more perfect completion of certain parts of the work.

It is urged that the acceptance of the road by the President up to this period was only provisional, and not final. We cannot perceive that this makes any difference. It was an

acceptance by which the company was enabled to receive its subsidy of government bonds; and was sought by it in order that it might obtain them.

It seems to us unnecessary to look further, or to review the subsequent proceedings which took place between the President and the company, in reference to the fulfilment of the conditions by the latter, on which the issue of the patents for the remaining lands depended. It appears that another commission was appointed to examine the road in 1874, and that, on their report, the President was satisfied that all the imperfections, as a security for the removal of which any patents had been suspended, were removed. The company insists that this was the period which should be taken for the completion of the road in reference to the payment of five per cent of its net earnings, — a period five years after it had reported the last section completed according to the act of Congress, and after the President, by virtue of the agreement aforesaid, had consented to accept it as completed for the purpose of enabling the company to draw its subsidy of government bonds, and after it had received said bonds.

Can a stronger case of estoppel than this well be presented? The plea that the government still retained a portion of the public lands which the company was to receive, as security for the supply of certain deficiencies in the road, cannot avail to diminish the strength of the estoppel. This was done by the voluntary agreement of the company itself. And as, by making this concession, it succeeded in obtaining the formal acceptance of its road for the sake of the benefit to accrue therefrom, to wit, the procurement of the subsidy bonds, the company ought to be willing to bear the burden of such acceptance, to wit, the payment annually of five per cent of the net earnings of the road on account of the bonds. It would be an unfair construction of the acts of the parties under the law, to hold that the road was completed for one purpose and not for the other. We think, therefore, that the Court of Claims was right in deciding that the road was completed on the sixth day of November, 1869, so far as the duty of the company to account for five per cent of its net earnings is concerned.

II. The question next arising is, What are the "net earn-

ings " for five per cent of which the company became liable to account, and in what manner are they payable?

In the first place, they are the "net earnings of the road;" that is, the net earnings of the road as a railroad, including the telegraph. They have nothing to do with the income or profits of the company as a holder of public lands. The proceeds of this source of income are no part of the earnings of the road. These earnings, however, must be regarded as embracing all the earnings and income derived by the company from the railroad proper, and all the appendages and appurtenances thereof, including its ferry and bridge at Omaha, its cars, and all its property and apparatus legitimately connected with its railroad.

In the present case, but little difficulty is presented in determining what are the proper earnings of the road, except in one particular. The company insists that the compensation accruing to it for services performed for the government, under the sixth section of the act of 1862, should not be estimated amongst the earnings of the road, in taking an account of net earnings upon which to calculate the five per cent in question. That compensation is not receivable by the company, — does not come into its hands, — at least was not receivable by it according to the act of 1862, but was directed by the sixth section to be applied to the payment of the subsidy bonds. After giving this direction, the section proceeds to add, that after the road is completed, " until said bonds and interest are paid, five per centum of the net earnings of said road shall also be annually applied to the payment thereof." It is contended that the net earnings here referred to are intended to be exclusive of said compensation for government service, no part of which the company was to receive. It must be admitted that there is some force in this view. But the majority of the court is of opinion that the plain letter of the statute cannot be thus varied by construction. The compensation accruing by means of services performed for the government is unquestionably earnings of the road and telegraph ; and as there are no words in the act which go to show any intention to except this portion of earnings from the other earnings of the road in estimating the amount of net earnings, the conclusion arrived at is, that no

such exception can be made. The fact that by a subsequent law the company is allowed to receive in money one-half of the compensation referred to, removes to a great extent the practical difficulties that have been suggested in this behalf.

There is another item in the table of earnings set forth in the eighteenth finding of the Court of Claims which may require consideration. We refer to the seventh item, entitled "company freight." If this means freight for the transportation of the company's own property over its own road, it ought not to be put down as a receipt, unless the same amount is also embraced amongst the expenses on the other side of the account. How this fact may be we have not before us the means of knowing. The evidence which the Court of Claims has in its possession will enable it to determine this matter. We merely decide that if the item appears only as a receipt or earning, and is of the character we have supposed, it ought to be excluded from the account.

Having considered the question of receipts or earnings, the next thing in order is the expenditures which are properly chargeable against the gross earning in order to arrive at the "net earnings," as this expression is to be understood within the meaning of the act. As a general proposition, net earnings are the excess of the gross earnings over the expenditures defrayed in producing them, aside from, and exclusive of, the expenditure of capital laid out in constructing and equipping the works themselves. It may often be difficult to draw a precise line between expenditures for construction, and the ordinary expenses incident to operating and maintaining the road and works of a railroad company. Theoretically, the expenses chargeable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the works and keeping them in good condition and repair; whilst expenses chargeable to capital include those which are incurred in the original construction of the works, and in the subsequent enlargement and improvement thereof. With regard to the last-mentioned class of expenditures, however, namely, those which are incurred in enlarging and improving the works, a difference of practice prevails amongst railroad companies. Some charge to construction account every

item of expense, and every part and portion of every item, which goes to make the road, or any of its appurtenances or equipments, better than they were before; whilst others charge to ordinary expense account, and against earnings, whatever is taken for these purposes from the earnings, and is not raised upon bonds or issues of stock.   The latter method is deemed the most conservative and beneficial for the company, and operates as a restraint against injudicious dividends and the accumulation of a heavy indebtedness.   The temptation is, to make expenses appear as small as possible, so as to have a large apparent surplus to divide.   But it is not regarded as the wisest and most prudent method.   The question is one of policy, which is usually left to the discretion of the directors.   There is but little danger that any board will cause a very large or undue portion of their earnings to be absorbed in permanent improvements. The practice will only extend to those which may be required from time to time by the gradual increase of the company's traffic, the despatch of business, the public accommodation, and the general permanency and completeness of the works. When any important improvement is needed, such as an additional tract, or any other matter which involves a large outlay of money, the owners of the road will hardly forego the entire suspension of dividends in order to raise the requisite funds for those purposes; but will rather take the ordinary course of issuing bonds or additional stock.   But for making all ordinary improvements, as well as repairs, it is better for the stockholders, and all those who are interested in the prosperity of the enterprise, that a portion of the earnings should be employed.   We think that the true interest of the government, in this case, is the same as that of the stockholders; and will be subserved by encouraging a liberal application of the earnings to the improvement of the works.   It is better for the ultimate security of the government in reference to the payment of its loan, as well as for the service which it may require in the transportation of its property and mails, that a hundred dollars should be spent in improving the works, than that it should receive five dollars towards the payment of its subsidy. If the five per cent of net earnings, demandable from the company, amounted to a new indebtedness, not due before, like a

rent accruing upon a lease, a more rigid rule might be insisted on. But it is not so ; the amount of the indebtedness is fixed and unchangeable. The amount of the five per cent and its receipt at one time or another is simply a question of earlier or later payment of a debt already fixed in amount. If the employment of any earnings of the road in making improvements lessens the amount of net earnings, the government loses nothing thereby. The only result is, that a less amount is presently paid on its debt; whilst the general security for the whole debt is largely increased.

We are disposed to agree, therefore, with the judge who delivered the concurring opinion in the court below, that the twenty-seventh item of expenditure, as stated in the table of expenses in the eighteenth finding, entitled " expenditures for station buildings, shops, &c.," is a charge that may properly be made against earnings, since, as the fact is, such expenditures were actually paid therefrom, and were not carried to capital account. Should the company ever attempt to make a stock or bond dividend in consideration of such expenditure, the government would be entitled to demand its due proportion thereof by way of payment on account of its debt. But as long as such expenditures are fairly and in good faith charged to account of earnings, we see no good reason for disallowing the charge.

Of course, the allowance of this item will supersede the deduction of fifteen per cent from the seventh item of earnings ; which item, however, is subject to the observations that have already been made upon it.

Expenses of the same kind as those included in item 27, which are contained in other items, and were disallowed by the Court of Claims, are to be allowed in like manner as those in item 27, including the expenses for issuing bonds.

We agree with the Court of Claims in its rejection of the expenditures contained in items 17 to 30 in the table referred to, excepting item 27. All payments of interest on the bonded indebtedness of the company should be charged to capital interest account, and not to current expenditures. Though payable out of earnings before any dividend can be made to stockholders, they cannot be deducted for the purpose of ascertaining the " net earnings " of the road, as that term is to be

understood in the sixth section of the act.   The bonded debt incurred for the purpose of construction and equipment is but another form of capital, analogous to preferred stock ; and the interest accruing thereon is in the nature of a dividend on such capital.   It has nothing to do with, and cannot affect, the amount of the net earnings of the road.

So the expenses of land and town-lot departments, and taxes on lands and town lots, are expenses properly belonging to the land department of the company's property.   They are entirely distinct from its expenses as a railroad company ; and form no proper charge, in the accounts, against the earnings of the road.

The other items disallowed by the court require no particular remark.   Their irrelevancy in the account of net earnings is obvious.

III.  We have still to consider the manner in which, and the conditions subject to which, the five per cent of net earnings is payable and demandable.

We have seen that by the fifth section of the act of 1862 the issue to the company of the subsidy bonds was to consti tute a first mortgage on the whole line of the railroad and telegraph, together with the rolling-stock, fixtures, and property of every kind and description, [and] in consideration of which said bonds should be issued.   By the act of July 2, 1864, this priority of the government claim was relinquished in favor of a certain amount of first-mortgage bonds which, by that act, the company was authorized to issue.   The provision referred to is contained in the tenth section of the act of 1864, which is as follows : —

"SECT. 10.  And be it further enacted, that sect. 5 of said act [of July 1, 1862] be so modified and amended that the Union Pacific Railroad Company, the Central Pacific Railroad Company, and any other company authorized to participate in the construction of said road, may, on the completion of each section of said road, as provided in this act and the act to which this act is an amendment, issue their first-mortgage bonds on their respective railroad and telegraph lines to an amount not exceeding the amount of the bonds of the United States, and of even tenor and date, time of maturity, rate and character of interest, with the

bonds authorized to be issued to said railroad companies respectively. And the lien of the United States bonds shall be subordinate to that of the bonds of any or either of said companies hereby authorized to be issued on their respective roads, property, and equipments, except as to the provisions of the sixth section of the act to which this act is an amendment, relating to the transmission of despatches and the transportation of mails, troops, munitions of war, supplies, and public stores for the government of the United States."

It is found by the Court of Claims that the Union Pacific Railroad Company did issue its first-mortgage bonds as authorized by this section, and to the full amount allowed thereby. The company contends that the interest of these bonds, if not its other interest, should be charged as an expenditure against the earnings of the road in taking an account of its net earnings, which would reduce the net earnings of each year by the amount of said interest. We have already expressed an opinion that this claim cannot be sustained. The interest on these bonds do not, any more than the interest of any other bonds of the company, form any proper portion of the expenditures of the road to be considered in estimating the net earnings mentioned in sect. 6 of the act of 1862.

But whilst we decide against the company on this point, we are clearly of opinion that the annual interest accruing on these particular bonds are to be first paid out of the net earnings, before the government can demand its five per cent thereof. We conceive this to be the legitimate effect of the concession by the government of its priority. It can hardly be pretended that, notwithstanding this concession, the five per cent to be applied in payment of the government bonds is to be first paid. It seems to us an absurdity to say that these bonds are entitled to a priority, but that the government must be first paid. This would be to grant a priority, and, in the same breath, to take it back again. It will not do to say that both must be paid, if there is not enough to pay both. It is a question between two parties having a claim against a common fund, and one of them having a priority over the other.

It may, perhaps, be urged that the first-mortgage bondholders have no lien on the net earnings. But it has the same lien

that the government has. Both liens are coextensive with the whole property of the company, so far at least as relates to the railroad and telegraph lines and their equipment and all property appurtenant thereto. There is a direction, it is true, that if the company makes net earnings, it shall pay five per cent thereof on its debt to the government. But that direction was contained in the act of 1862; the authority to issue the first-mortgage bonds, and the concession of priority thereto, was given two years afterwards, and is the controlling enactment. It cannot be supposed, after this transaction, that the company is bound to pay the government first, and to allow the interest on the first-mortgage bonds to go unpaid, or, in order to pay it, to go out in the money market and make a new loan. Such could never have been the intention of the law. Not to pay the interest on the first mortgage would expose the road and works to be seized and sold, — a result, certainly, that could not be to the interest of the government, when we consider that its entire debt is postponed to the first mortgage, and would be liable to be lost by such a proceeding. Borrowing money to pay the interest (if it could be borrowed) would only be to put off the evil day.

The interest accruing on the first mortgage is as much payable out of the net earnings as the five per cent payable to government is. It is the proper fund out of which to pay both; and if but one can be paid, the former has the precedence; or else the whole government debt might be paid to the exclusion of the first mortgage, which is admitted to have the priority. Such a result would be manifestly absurd.

The truth is, that the provision for paying five per cent of the net earnings on the subsidy debt was a provision for payment out of a particular fund. If by voluntary agreement on the part of the government a portion of that fund is appropriated to another purpose (which we think it is), then the government is entitled to go against the balance only. The provision created no new obligation or indebtedness, but only entitled the government to anticipate part payment of a fixed indebtedness out of a particular fund, if there should be such a fund. If the fund should not arise, or should be exhausted by claims to which the government gave priority over its own

claim, there would clearly be nothing for the government to demand.

It is not like the case of two mortgages, one prior to the other, and both having claims for interest coming due. In such case, if both claims are not paid, the one which is not paid becomes a cause of action, and may be put in suit. Here, the claim of the government is on the fund alone. If that is exhausted by its own consent, no cause of action arises. There is simply nothing left of the fund to which it has a right to resort.

The government, however, may contend that if there is not a sufficient surplus of net earnings in one year to pay the five per cent due for that year, it may be carried over to a succeeding year, and taken out of the surplus thereof. We do not think that this position is more tenable than the other. Each year is to stand by itself. If there is a deficit in any year instead of net earnings, such deficit cannot be carried over into the next year's accounts by the company; and if there are net earnings which are absorbed by the interest due on the first mortgage, the claim of five per cent cannot be carried over into the next year by the government. The one is no more a debt than the other is a credit. The statute makes the application an annual one. If the year produces net earnings sufficient for the purpose, the government gets its five per cent; if it does not produce sufficient, the government does not get its five per cent; and there the account ends for that year. It was never intended that this account should be carried on from one year to another.

This seems to us to be the fair and reasonable construction of the statutes, and one that does no injustice to either of the parties. The object of Congress in all of them was to extend a liberal hand in aid of the enterprise which the company undertook to carry out, and not so exact, in addition to the amount of service which the company was required to perform, the payment of any part of its loan before maturity, except a small portion of the net earnings of the road which the company would be presumed to have in its hands. So far as these were otherwise disposed of by the government's own consent, the application to its debt must be regarded as intended to be waived.

The fact that by the ninth section of the act of March 3, 1871 (16 Stat. 525), the Secretary of the Treasury is required to pay over in money to the companies one-half of the compensation for the services performed by them for the United States, has no bearing on the question now under consideration. The statutes out of which this question arises were all passed long before, and are to be construed as if the act of 1871 had never been passed.

We may add, in conclusion, that Congress, by the act passed May 7, 1878 (20 Stat. 56), supplementary to the acts of 1862 and 1864, has expressly directed that, in estimating the net earnings of the roads, the interest of the first-mortgage bonds, as well as the current expenses, is to be deducted from the gross earnings. Whilst this enactment cannot be invoked as furnishing any decisive rule for the construction of the statutes under review, it at least shows that Congress deems the interest of said first-mortgage bonds 'as fairly entitled to priority of payment out of the earnings of the road, before the payment of any portion thereof on the government debt. We think, therefore, that we are justified in supposing that our conclusion is in harmony with the views of the legislature, as to the justice and right of the case.

The conclusions to which we have come on the whole case will require the following modifications of the decree appealed from : —

*First*, In estimating the amount of gross earnings, no deduction will be made from the earnings included in items 7 or 12, as set forth in the table contained in the eighteenth finding of the Court of Claims, unless it be found that item 7, entitled " company freight," is for transporting the company's own property on its road, and is not balanced by being also contained among the expenditures. If this be the case, then the whole of item 7 should be struck out.

*Secondly*, In estimating the amount of expenditures to be deducted from gross earnings, the claimant should be credited with the expenditures contained in item 27 of the table of expenditures, and the other expenses which are disallowed by the Court of Claims, except items 17 to 26 inclusive, and items 28, 29, and 30, which are properly disallowed.

*Thirdly*, If with these modifications it should be found that the net earnings, in any one year, were not more than sufficient to pay the interest on the first-mortgage bonds accruing in said year, then the company will not be decreed to pay any portion of the said five per cent of net earnings for that year. But if the net earnings were more than sufficient to pay said interest, the excess will be subject, as far as it will go, to the payment of said five per cent; but the company will not be decreed to pay any more than said excess.

The decree will be reversed with instructions to enter a decree in accordance with this opinion; and it is

*So ordered.*


MR. JUSTICE STRONG, with whom concurred MR. JUSTICE HARLAN, dissenting.

I concur with the majority of the court in holding that the railroad was completed, within the meaning of the sixth section of the act of 1862, on the sixth day of November, 1869. I concur also in the definition of "net earnings," as the term was used in that section. But the majority now express the opinion that if the net earnings in any one year are not more than sufficient to pay the interest on the first-mortgage bonds of the company in that year, the United States is not entitled to any portion of five per cent of those earnings for that year, though, if they are more than sufficient to pay that interest, the excess or surplus is subject, so far as it will go, to the payment of the five per cent. This is substantially holding that the claim of the government to the annual payment of five per cent of the company's net earnings, after the completion of the road, is postponed to the annual interest on the first-mortgage bonds. To this I cannot assent. It is, I think, based upon an entire misconstruction of the acts of Congress which gave existence to the company, and to which alone we can look for the contract between it and the government. A very few words will indicate my opinion, and show the reasons upon which it rests. By the fifth section of the act of 1862, the Secretary of the Treasury was required to issue to the company bonds of the United States to an amount therein specified. The bonds were to be issued as a loan, and the section provided as follows:

" And to secure the repayment to the United States, as hereinafter provided, of the amount of said bonds so issued and delivered to said company, together with all interest thereon which shall have been paid by the United States, the issue of said bonds and delivery to the company shall, *ipso facto*, constitute a first mortgage on the whole line of the railroad and telegraph, together with the rolling-stock, fixtures, and property of every kind and description, and in consideration of which said bonds may be issued." This clause describes the lien, and the only lien, reserved by the United States. It covers the railroad and telegraph, the rolling-stock and fixtures, and property of every kind and description. It does not cover income from the property, either gross receipts or net receipts derived from its use, while it remains in the possession of the company and before any forfeiture for breach of the conditions of the mortgage. A mortgage of a property is a very different thing from a mortgage of its income. The mortgagor, so long as he remains in possession, or until actual entry by the mortgagee, may receive the rents and profits to his own use, and is not accountable for them to the mortgagee. *Fitchburg Cotton Manufactory Corporation* v. *Melven et al.*, 15 Mass. 268; *Boston Bank* v. *Reed et al.*, 8 Pick. (Mass.) 459. Indeed, it is clear law that a mortgagee has no specific lien upon the rents and profits of mortgaged premises until condition broken. *The Bank of Ogdensburgh* v. *Arnold and Others*, 5 Paige (N. Y.), 38. I think it very apparent that in the reservation of the lien Congress did not intend to interfere with or assert rights over the earnings of the railroad, or to prevent their appropriation to the general uses of the company. They were not intended to be covered by the lien, or embraced within it. And I am confirmed in this belief by the fact that, immediately following the clause in the fifth section describing the lien, a right was reserved to the United States to take possession of the road on failure of the company to redeem the bonds loaned.

Assuming that I am correct in this, I pass to the sixth section of the act, which makes no reference to the lien, though it imposes duties upon the company. It enacts that the grants aforesaid are made upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and tele-

graph in repair and use, shall transmit despatches at all times over said telegraph line, and transport mails, troops, &c., for the government when required, giving to the government the preference in the use of the road and line for all the purposes aforesaid. The section then declares that all compensation (subsequently changed to one-half thereof) for services rendered for the government shall be applied to the payment of the bonds and interest, so as aforesaid named, until the whole amount is fully paid. Then follows the clause which the United States is seeking in this action to enforce. It is as follows : "And after said road is completed, until said bonds and interest are paid, at least five per centum of the net earnings of said road shall also be annually applied to the payment thereof." The grants referred to in this section, and declared to be conditional, are probably those of the right of way and alternate sections of land given previously in the preceding sections. They can hardly refer to the loan of bonds. This, however, is not very material. While it is true that the section refers to payment of the debt due to the United States, it contains no allusion to the lien for the security of the debt reserved in the fifth section. And it can hardly be pretended that performance of the duties thereby imposed upon the company is secured by the statutory mortgage. The mortgage is not a security for having the road and telegraph kept in order, nor for the transmission of despatches, or the transportation for the government, nor for priority of use by the government, nor for the application to the payment of the bonds of half the compensation for services to the government. Nor is it any more a security for the required payment of a percentage of the net earnings. These duties are secured by the condition attached to the land grants, and by the implied assumption of the company. They are entirely collateral to the obligation and lien of the mortgage. They are not a part of it. It is no uncommon thing that a creditor has several securities for one debt. He may have a bond and a mortgage to secure its payment; he may have also a promissory note, or an assignment of stock. Nobody would claim that in such a case the note and the assignment are included in the lien of the mortgage.

Having thus shown, as I think, what the lien of the govern-

ment was, what it covered, and what it did not, I pass to the tenth section of the amending act of 1864, by which, as construed by a majority of the court, the claim of the United States to a percentage annually of the net earnings of the road, is postponed to the rights of what is called the first mortgage of the company.   That section authorized the company, and other companies, to issue their first-mortgage bonds on the *roads and telegraph lines* to an amount not exceeding the bonds of the United States, and of even tenor and date, time of maturity, rate and character of interest, with the bonds authorized to be issued to them.   It then declared thus: " And the lien of the United States shall be subordinate to that of the bonds of any or either of said companies hereby authorized to be issued on their respective roads, property, and equipments, except as to the provisions of the sixth section of the act to which this act is an amendment, relating to the transmission of despatches, and the transportation of mails, troops, munitions of war, supplies, and public stores for the government of the United States."

The first mortgage thus authorized was less comprehensive than the statutory mortgage of the United States.   It did not include the lands of the company, nor any of its property, except the road and the telegraph line.   It certainly did not include the earnings of the company.   What, then, was subordinated to it?   I think nothing but the lien of the United States bonds, — that lien which was reserved in the fifth section of the act of 1862.   This is the express language of the section. Whatever right to the railroad and telegraph line the United States had by virtue of its mortgage, that right was postponed to the mortgage bonds authorized by this tenth section, and issued under it.   Nothing else was postponed.   Subordination of the lien of the United States to the company's first mortgage could not have the effect of enlarging the operation and scope of that mortgage and bringing additional subjects within it. Surely it did not make the mortgage a lien upon any other property than that which the company was authorized to mortgage.   It did not make it a lien, either prior or subsequent, upon the lands of the company, or the income or earnings of its road.   And as I think I have shown the duty of the com-

pany to apply annually five per cent of its net earnings, after the completion of its road, to the payment of its debt to the United States, was collateral to its other obligations, — a cumulative duty, not embraced in the lien or mortgage reserved by the United States in the fifth section of the act of 1862, — it cannot be affected by the tenth section of the act of 1864. Whatever else was postponed, it was not.

It has been argued on behalf of the appellant that the exception from the subordinating clause of those provisions of the sixth section of the act of 1862, relating to the transmission of despatches, and the transportation of mails, troops, munitions of war, supplies, and public stores for the government of the United States, implies that the other provisions of that section, or at least the five per cent provision, were intended to be subordinated to the lien of the first-mortgage company bonds. This supposed implication is the principal reason urged in support of the position taken by a majority of the court. It is, however, in my judgment, entirely unfounded. The purpose of the exception appears to me to be very plain. As I have noticed, the section authorized the company to issue their first-mortgage bonds upon the railroad and the telegraph line, and enacted that the lien of the United States bonds should be subordinate to the company's first-mortgage bonds. Subordinate, clearly, only in its effect upon that which was covered by the company's mortgage, namely, the road and the telegraph line. But if the company's mortgage was permitted to be without exception the paramount lien upon the road and telegraph line, the right secured to the United States by the sixth section of the act of 1862 to the transmission of despatches, and transportation of the mails, &c., might be totally destroyed by a foreclosure of the mortgage and a sale under it. To guard against this possibility was evidently the sole purpose of the exception, and its necessity is manifest. I repeat, if the company's authorized mortgage on the railroad and the telegraph line were permitted to be, without restriction, a paramount lien, the preferential right secured to the United States by the conditions of the sixth section of the act of 1862 — the right to the transmission of despatches and transportation of mails, stores, munitions of war, &c., in preference to

others — would have been at the mercy of the company's mortgagees. That right of priority Congress was not willing to endanger. The exception was introduced to avert the danger of its loss. Congress, in effect, said to the company, "Though we agree that your mortgage shall be the first lien upon the road and the telegraph line, yet no foreclosure of it, no taking possession under it, and no sale shall interfere with the right of the United States to the transmission of despatches and to transportation in preference to all others." To save that right the exception was necessary. It had reference solely to the operation of the company's mortgage upon the *road*, upon which a preferential right to transportation had been reserved, and to the *telegraph line*, along which government despatches were first to be carried. I cannot believe it had any other purpose or intent, much less that it was intended to operate as a grant, or to postpone the other rights assured to the United States in the sixth section. The implication that every duty in that section imposed upon the company, except the one expressly mentioned, was intended to be subordinated to the lien of the company's bonds is too unreasonable to be accepted, and it will not be claimed. Yet such must be the extent of the implication, if the exception means what the majority of the court think it means. If the duty of the company to apply to the payment of its bonds a percentage of its net earnings annually after the completion of its road is postponed to the rights of the first-mortgage bondholders, so is the duty to apply one-half the compensation for services rendered for the government, and so is the duty to keep the railroad and telegraph line in repair, by parity of reason. Those rights of the government and the right to the percentage of the earnings stand alike. They are all reserved by the tenth section of the act of 1864.

My conclusion, therefore, is that nothing in the tenth section of the act of 1864 postpones the right of the government to recover five per cent of the net earnings of the road before any thing is deducted from those earnings for either principal or interest of the first-mortgage bonds of the company.

It may be that the construction of the acts of Congress for which I contend, if adopted by the court, would not increase

the amount recoverable by the United States in the present suit, but it may have an important effect on future claims against the company for the five per cent, and it has upon the claims of the United States against the other companies to which the sixth section of the act of 1862 was applicable.