# MANNING

*v.*

# THE CHESAPEAKE AND POTOMAC TELEPHONE COMPANY.

EQUITY JURISDICTION; CONSTITUTIONAL LAW; LEGISLATIVE POWER TO REGULATE CALLINGS; TELEPHONE SERVICE; CORPORATIONS; CONTRACTS; BURDEN OF PROOF.

1. Where a telephone subscriber by a suit in equity for an injunction sought to compel a telephone company to continue furnishing him telephone service at a rate fixed by statute, which was less than the former rate charged by the company and paid by him, and to restrain the company from removing its instrument from his place of business, and a large mass of testimony was taken by the parties to determine whether the rate as fixed by law was reasonable, and the lower court, while expressing the opinion that the proper remedy was by *mandamus*, considered the case on its merits and dismissed the bill, and the defendant on appeal by the complainant to this court declined to raise the question of jurisdiction, it was *held* that this court would not of its own motion raise the question of jurisdiction, although upon consideration it might appear that the complainant had an adequate remedy at law.

2. The exercise of the legislative power to regulate callings affected with a public interest, is not dependent upon notice and hearing and it will be presumed that the legislature, in a given case, acted with due knowledge and fair consideration of all the facts and circumstances of the situation.

3. A telephone company incorporated under the laws of another jurisdiction and doing business in this District by sufferance only, may be compelled to perform its accustomed service at a rate fixed by Congress as a condition to its remaining and doing business here, although the rate so fixed may be wholly insufficient to meet the necessary expenses of the service to be performed.

4. Contracts of a corporation relating to loans, supplies, royalties and services are incidents of corporate existence and franchises; and all persons contracting with a corporation in those particulars do so subject to the dissolution of the corporate existence or the ter-

mination of special franchises by limitation, by judicial decree or by repeal where that power exists.

5. One who invokes judicial relief against a statute regulating a calling affected with a public interest and fixing charges for services rendered, must show beyond a reasonable doubt that the enforcement of the statute will be destructive of property rights.

6. In considering the evidence and determining whether compensation for telephone service as prescribed by law is destructive of the property rights of an existing telephone company, the basis of estimation is properly the reasonable, actual value of the property used in the business, cost of maintenance and the expense of carrying on the business.

7. The testimony reviewed in a case in which a foreign telephone company doing business in the District of Columbia claimed that the provision of the appropriation act of Congress of June 30, 1898, making it unlawful for any telephone company doing business here to charge a greater rate for telephone service than that fixed by the act, was invalid as confiscating its property by fixing a rate for such service less than cost, and the opinion expressed that the evidence did not show that the necessary effect of the enforcement of the rate would be destructive of the company's rights of property.

No. 1008.   Submitted March 21, 1901.   Decided May 21, 1901.

Hearing on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, dismissing a bill in equity for an injunction.   *Reversed.*

The Court in its opinion stated the case as follows:

This suit was begun by the appellants J. Forrest Manning and Harry E. Rupprecht, trading as J. Forrest Manning & Co., in the Supreme Court of the District of Columbia to compel the Chesapeake and Potomac Telephone Company to continue to furnish them the ordinary service of the Washington telephone exchange upon payment of the annual rate prescribed in the act of Congress of June 30, 1898. This regulation of rates is contained in a proviso added to an item of the general appropriation bill of that date, and reads as follows:

" *Provided,* that from and after the passage of this act it shall be unlawful for any person or any telephone company

doing business in the District of Columbia to charge or receive more than $50 per annum for the use of a telephone on a separate wire; $40 for each telephone, there being not more than two on a wire; $30 for each telephone, there being not more than three on a wire, and $25 for each telephone, there being four or more on the same wire." 30 Stat. 537, 538.

The Chesapeake and Potomac Telephone Company, then, as now, owned and operated the only telephone plant in the District of Columbia.

On July 1, 1897, plaintiffs entered into a contract with the defendant, whereby the latter agreed to furnish them its improved appliances, with special metallic circuit, for use in their business offices, and for which they promised to pay the sum of $125 per annum, quarterly, in advance, and $10 additional per annum for an extra desk cabinet equipment. By special provision the contract was declared to continue from year to year, subject to termination by either party, after the first year, upon ten days' notice.

Upon the passage of the aforesaid act plaintiffs gave notice of termination of the contract, and then, ten days later, notified defendant that they would retain the telephone equipment at the rate of $50 per annum, as provided by law. They also tendered payment in advance at said rate. Defendant declined to accept payment at said rate on the ground that the same was less than the cost of service, but offered to continue at the former contract rate, or else to remove its telephone equipment from plaintiffs' office and discontinue their service. Alleging these facts, and renewing the tender of payment of the statutory rate, plaintiffs' bill prayed that defendant be enjoined from removing their telephone appliances, and from refusing or neglecting, when requested, to furnish them the usual telephone connections and service.

The defendant's answer averred that its service could not be maintained at the rate fixed by the act of Congress without actual loss, and denied the power of Congress to compel it to furnish the same for less than cost, because the effect

13

would be the confiscation of its property. The temporary injunction prayed for was granted August 4, 1898. About fifty like suits were filed by other subscribers. These were practically consolidated with this suit, in which alone testimony has been taken, and made to abide its result.

A great volume of testimony was taken by the parties, and the cause came on to be heard February 5, 1900. The result was a final decree dismissing the bill, from which this appeal has been duly prosecuted.

The first public use of the telephone in the city of Washington was begun by Geo. C. Maynard late in the year 1878, under a contract with Gardiner G. Hubbard, trustee, for the agency and use therein of the inventions of Alexander Graham Bell. Maynard was made exclusive agent for the rental of the Bell telephones and call bells which were to be supplied to him. He was to erect lines, use diligence to bring the telephones into use and for compensation to receive a percentage of the rentals of instruments. A subsequent agreement ratifying the foregoing and extending it to certain other inventions controlled by the Western Union Telegraph Company was made with Maynard by the National Bell Telephone Company, which had in the meantime become the assignee of the Bell patents and others. About December 1, 1879, Maynard conveyed his plant, rights, etc., to the National Capital Telephone Company, a corporation created under the laws of West Virginia.

March 31, 1883, this company entered into a contract with the American Bell Telephone Company for the use of its telephones upon an agreed division of the proceeds of their rentals to subscribers.

Shortly after this the Chesapeake and Potomac Telephone Company was incorporated by the laws of the State of New York for the purpose of acquiring the property and consolidating the business of the National Capital Telephone Company, operating in the District, and of the Telephone Exchange Company, a corporation of West Virginia, then operating in Maryland. The capital stock of the Chesapeake and Potomac Telephone Company was fixed at $2,650,000.

On July 30, 1883, the National Capital Telephone Company, in consideration of $750,000 of the capital stock of the Chesapeake and Potomac Telephone Company, transferred to the latter all of its plant, property and rights of every description.

At the same time the Chesapeake and Potomac Telephone Company acquired all the rights, property, etc., of the Telephone Exchange Company in Maryland. The consideration was the delivery of $1,900,000 of the capital stock of the assignee. By the terms of the agreement of transfer $630,000 of this stock was to be delivered to the National Bell Telephone Company and $1,270,000 to the Telephone Exchange Company. Of this last $100,000 was to be passed to trustees for the use of the Chesapeake and Potomac Telephone Company, and subsequently $62,600 thereof was assigned to the National Bell Company aforesaid and $37,400 sold in the market for the sum of $24,546.67.

The actual value of the visible property received by the Chesapeake and Potomac Telephone Company under these conveyances was the following: From the National Capital Telephone Company, cash, bills receivable and supplies, $77,334.93; plant valued at $91,130.21. Total, $168,465.14.

From the Telephone Exchange Company, cash, bills receivable and supplies, $45,045.24. Plant valued at $300,000. Total, $345,045.24.

The difference between the face value of the stock — $750,000 — delivered to the National Capital Company and the actual value of the property received — $168,465.14 — is represented solely by the valuation of the franchises of the latter company at $581,534.60.

The difference between the face value of the stock — $1,900,000 — delivered to the Telephone Exchange Company and the actual value of the property received therefrom — $345,045.24 — is represented solely by the franchises of the latter company, estimated, $1,554,954.76.

The Chesapeake and Potomac Telephone Company, after taking over the property and franchises of the other corpo-

rations, began to carry on the business in the District of Columbia, throughout Maryland and a small part of West Virginia. In conducting this business it has charged 40 per cent. of its general office expenses against the plant operated in the District, where its general office is kept. Since 1891 it has issued and sold $500,000 of 6 per cent. bonds, two-fifths of which are also charged against the District plant.

Congress has passed no act incorporating the defendant, or giving it license to carry on its business in the District of Columbia.

The only recognition that it claims is to be found in certain items and clauses of appropriation bills, beginning with that of July, 1888. In that act it was provided, after an appropriation for telephone service, that the Commissioners of the District might authorize the wires of any " existing telegraph, telephone or electric light company now operating in the District of Columbia," to be laid under the streets, alleys, etc., " whenever in their judgment the public interest may require the exercise of such authority — such privileges as may be granted hereunder to be revocable at the will of Congress without compensation." 25 Stat. 323, 324.

An item continuing this authority for another term of Congress under the same condition was contained in the act of March 2, 1889. Idem, 804.

The act of August 7, 1894, authorized the erection and use of telephone poles in the public alleys, but the privilege was made subject to revocation at the will of Congress without compensation. 28 Stat. 256.

The act of March 3, 1897, provided that hereafter no wire shall be strung on any alley pole at a height of less than fifty feet from the ground at the point of attachment to said pole; and it was declared that nothing herein contained shall authorize the erection of any additional pole upon any street, avenue or reservation.

The usual condition of revocation at will without compensation was again added. 29 Stat. 678.

Appropriation bills subsequent to · that containing the

clause regulating charges merely appropriate money to pay defendant's accounts for services rendered.    30 Stat. 117; Idem, 126.

*Mr. Arthur A. Birney, Mr. John J. Hemphill, Mr. H. F. Woodard* and *Mr. Arthur Peter* for the appellants:

1. The appellee is not chartered by Congress, so there can be no claim of a contract right to pursue its business (which necessarily involves the use of public property) or to charge any particular rates. A New York corporation, it is here by sufferance only, yet it really denies to Congress the legislative control given by the Constitution. Had Congress chartered this company, and reserved (as in the cases of street railway, gas and electric light companies) the right of repeal of such charter, there could be no doubt of its right to terminate all powers of the company; compel it to remove its conduits, cables, wires and poles from the public ways, and thereby destroy its business and convert its corporeal property into old junk. Because the company has no contract, but only a bare permission to pursue its business, does it stand in better position to deny to Congress the power of control? Is the reserve power which Congress would now have, had it *authorized* the company's operations, nonexistent because it has *permitted* them? Would not Congress now have the legal right by direct legislation to exclude this foreign corporation from doing business in this District? If yes, then even though the untrue contention that this act of general legislation will *indirectly* effect the same result be established, how may it be claimed that this is unlawful? By what means has this foreign corporation secured vested rights to conduct its business at a profit in this District? That a foreign corporation does business only through comity and not by right is well settled. *Paul* v. *Virginia,* 8 Wall. 168; *Phil. Fire Ins. Co.* v. *N. Y.,* 119 U. S. 110, 119; *Pembina Mining Co.* v. *Penn.,* 125 U. S. 181. As well illustrating the completeness of the sovereign power of Congress in the premises, see *Mormon Church* v. *U. S.,* 136 U. S. 1.

2. The remedy is by injunction, not by *mandamus*. The denial of jurisdiction and assertion that the proper remedy in such cases as this is by *mandamus* was a surprise, since the proposition was not asserted by the answer or suggested by counsel or the court during the argument before the lower court. Had the learned judge suggested it he would have learned that at the time of the filing of this bill one O. G. Staples took action by *mandamus* to compel defendant company to furnish him telephone service, and that his petition was denied on the ground that the statute in force here authorizing a traverse of the return to the writ and trial of facts applies only to proceedings to try the right to public office, and does not extend to proceedings to secure private rights even from a public-service corporation. Stat. 9 Anne, Ch. 20; Alex. British Stat. 693. At common law, and until 1831, in Great Britain, except in the cases covered by the statute of 9 Anne, there was no right to traverse the return to the writ of *mandamus*. Moses on *Mandamus,* 203, 214; Tapping on *Mandamus,* 422, 481.

No statute has been passed to extend the right here, as has been generally done in the States. The application here is to enjoin the defendant from taking from the premises of complainant the telephone therein, and from neglecting or refusing to furnish telephone exchange service as heretofore; it distinctly differs from the cases cited by the court, such as that from Maryland (66 Md. 399) where the application was for a *mandamus* to compel the telephone company to put up a telephone and its appliances and render service. Both the preventive and mandatory injunctions may be included in one decree. 1 Beach on Injunctions, Sec. 97. The mandatory injunction is growing in favor, and the same caution, and no more, is required in the granting of either the preventive or the mandatory injunction. 1 Beach on Injunctions, Sec. 101. See also *Broome* v. *N. Y. & N. J. Tel. Co.,* 42 N. J. Eq. 141; *Webber* v. *Gage,* 39 N. H. 182 and 196; *Vincent* v. *RR. Co.,* 49 Ill. 33, 43 and 44; *Lane* v. *Newdigate,* 10 Vesey, p. 193; 2 Redfield on R'ys, Sec. 221; *Lucas* v. *Cumerford,* 1 Vesey, Jr. (Sumner's Ed.) 235, note 2; Mil-

ler, J., in *Chicago, etc.* v. *Minn.*, 134 U. S. 460; *Smyth* v. *Ames,* 169 U. S. 517, 518. The suggestion that an action for damages would be an adequate remedy cannot be accepted. By what evidence would damages be calculated?

3. Congress has the right to regulate charges by direct legislation. That the defendant company is a public-service company, subject to be controlled in its rates within reasonable bounds by Congress, is not denied by the answer, and must be conceded. When property is affected with a public use, " the business in which it is used is subject to legislative control. So long as the use continues the power of regulation remains, and the regulation may extend, not merely to the provisions for the security of passengers and freight against accident and for the convenience of the public, but also to prevent extortion by unreasonable charges and favoritism by unjust discriminations. This is not a new doctrine, but an old doctrine, always asserted whenever property or business is, by reason of special privileges, received from the Government, the better to secure the purpose to which the property is dedicated or devoted, affected with a public use." 128 U. S. 179. This doctrine has been declared applicable to telephone companies; *Hockett* v. *State,* 105 Ind. 250; *Central Union Tel. Co.* v. *Bradbury,* 106 Ind. 1; *Johnson* v. *State,* 113 Ind. 143; *Central Union Tel. Co.* v. *State,* 118 Ind. 194; *State* v. *Bell Tel. Co.,* 36 Ohio St. 296; *Ches. & Pot. Tel. Co.* v. *Balt. & Ohio Tel. Co.,* 66 Md. 399; *State* v. *Nebraska Tel. Co.,* 8 Am. & Eng. Corp. Cases, 1; to elevators and warehouses; to railroads; to street railroads; to canals; to ferries; to toll roads; to wharves; to natural gas companies; to water supply companies; to mills, and to various other kinds of business. See cases collected in note 38 L. R. A. 177. The decisions in the Supreme Court are: *The Granger Cases,* 94 U. S. 113, 164, 179, 180; *Ruggles* v. *Illinois,* 108 U. S. 526; *R.R. Com. Cases,* 116 U. S. 307, 347, 352; *Dow* v. *Beidelman,* 125 U. S. 680; *Georgia R.R., etc.,* v. *Smith,* 128 U. S. 174; *Chicago, etc., R.R. Co.* v. *Minnesota,* 134 U. S. 418; *Minn. R'way Co.* v. *Minnesota,* 134 U. S. 467; *Chicago RR. Co.* v. *Wellman,* 143 U. S. 339;

*Budd* v. *N. Y.,* 143 U. S. 517; *Brass* v. *Stoever,* 153 U. S. 391; *Reagan* v. *Farmers' L. & T. Co.,* 154 U. S. 362; *RR. Co.* v. *Gill,* 156 U. S. 649; *Covington, etc., Turnpike Co.* v. *Sanford,* 164 U. S. 578; *Smyth* v. *Ames,* 169 U. S. 466; *San Diego Land Co.* v. *National City,* 174 U. S. 757.

4. The power of Congress to impair contracts. The court below denied to Congress the power to impair the obligation of contracts " except in a case where it is given *express power to legislate on a given subject.*" No authority is cited for this opinion, and it is distinctly at variance with the views of the Supreme Court. *Legal Tender Cases,* 12 Wall. 550. That Congress, having the right to legislate at all upon the subject, has the power to directly or indirectly impair the obligation of contracts, is now too well settled to admit of further discussion. *McCullough* v. *Maryland,* 4 Wheat. 405; *Legal Tender Cases,* 12 Wall. 457, 501, 523, 539, 547; *RR. Co.* v. *Iowa,* 94 U. S. 155, 157, 159; *Sinking Fund Cases,* 99 U. S. 718; *Mitchell* v. *Clark,* 110 U. S. 643. The only limitation upon the rights of the States to impair the obligations of contracts within their borders is found in the Federal Constitution. Before the adoption of that Constitution they might and did so legislate, the courts not recognizing any natural obstacle. Argument of Mr. Potter in *Legal Tender Cases,* p. 503; *Owings* v. *Speed,* 5 Wheat. 420.

5. The statute applies to all telephones. The contention of the answer that the statute applies only to telephones used by the District of Columbia is without force. That the intention of Congress was to regulate the charges to all users is manifest. The fact that the legislation follows the word " provided " cannot affect the question. *Georgia Banking Co.* v. *Smith,* 128 U. S. 181.

6. The burden of proof as to rates. The legal presumption being in favor of the validity of the statute, the burden was upon the defendant to establish its invalidity *as an inevitable conclusion, and beyond a reasonable doubt.* It was bound to show " a repugnancy to the supreme law of the land too clear to admit of dispute." *Pine Grove* v. *Talcott,* 19

Wall. 666; *Legal Tender Cases,* 12 Wall. 531; *Henderson Bridge Co.* v. *Henderson City,* 173 U. S. 615.

We cannot but think that this rule was lost sight of by the judge below, who dealt with the facts as though to determine the preponderance of proofs. The courts will not lightly declare an act of Congress void, and in this case the burden was upon the defendant to prove *beyond a reasonable doubt* that the rates fixed by the act are so low as to make that act unconstitutional. *Smyth* v. *Ames,* 169 U. S. 466; *San Diego Land Co.* v. *National City,* 174 U. S. 739; *Covington Turnpike Co.* v. *Sanford,* 164 U. S. 578.

In the court below counsel for defendant earnestly insisted that the rule that before declaring a statute unconstitutional the court must be so satisfied beyond a reasonable doubt, applied only to questions of law and not to questions of fact. There is not only no such distinction in the application of the rule, but it will be observed that in the last two cited cases in the Supreme Court the questions before the court were questions of fact only. Counsel for the defendant in his argument below cites the case of *Reagan* v. *Trust Co.,* 154 U. S. 411, to show that the court calls attention to the fact " there are $15,000,000 of bonds outstanding and there is not sufficient income to pay the operating expenses and pay the interest on the bonds." That case can hardly be held as an authority here because the conditions in the two cases are so diametrically opposed.

7. In determining the question of the validity of the statute fixing rates we have the right to consider the probable increase of business at the lower rates, for all experience suggests the probability that a reduction of rates will increase the amount of business, and therefore the earnings. *Smyth* v. *Ames,* 169 U. S. 466; *Chicago* v. *Wellman,* 143 U. S. 339.

8. Not only has the defendant company failed to demonstrate beyond a reasonable doubt that the statute rates are so low as to amount to confiscation of its property, but it is affirmatively established by the evidence[*] that these rates

---

[*] The appellants' brief and that of the appellee contain exhaustive analyses of the testimony, which are too lengthy to be inserted in this report.—REPORTER.

are much in excess of what is necessary to the payment of all expenses of maintaining and operating the plant and the return of fair or even large dividends upon the value of the property to those who hold its bonds and stock.

*Mr. J. M. Wilson, Mr. A. S. Worthington, Mr. E. W. Van Dyke* and *Mr. Charles L. Frailey* for the appellee:

1. Because the defendant is a foreign corporation its property is not subject to confiscation at the will of Congress. Fifth and Fourteenth Amendments to the Constitution of the United States. The Supreme Court of the United States has several times held that while the legislature of a State may prescribe rates to be charged by any "public-service" corporation, an act fixing such rates will amount to confiscation, and will for that reason be held void by the courts if the rates be insufficient to enable the corporation to pay its expenses and earn a reasonable compensation for the service rendered. *Reagan* v. *Farmers' L. & T. Co.,* 154 U. S. 362; *Railroad Commission Cases,* 116 U. S. 307; *Smythe* v. *Ames,* 169 U. S. 466; *San Diego Land Co.* v. *National City,* 174 U. S. 739; *Covington, etc., Turnpike Co.* v. *Sandford,* 164 U. S. 578, 595.

Until the present case, so far as we know, a similar question has not arisen as to the powers of Congress as limited by the language of the fifth amendment. But it is manifest that the same effect must be given to the language of the fifth amendment in dealing with acts of Congress that had been given to the corresponding provision in the fourteenth amendment in dealing with the acts of the legislatures of the several States.

Counsel for the complainants in their brief in this court for the first time in this case suggest that the property of this defendant may be confiscated by Congress, because it is not incorporated under any act of Congress or under the general incorporation law of the District, but is a New York corporation. They seem to have found no authority in support of this contention.

It is asserted in the brief that the defendant " is here by sufferance only." In their bill of complaint the complainants say that the defendant " has, with the assent and under the direction of the Congress of the United States and of the Commissioners of the District of Columbia," established its plant in the District. There are many acts of Congress, some of which expressly and others by necessary implication authorize the defendant to carry on the telephone-exchange business in this District. It does not, however, seem to us that in this respect it can make any difference whether a public-service corporation organized under the laws of one of the States of this Union, lawfully carrying on its business in the District of Columbia, is doing so by the express consent or merely by the implied acquiescence of Congress. It is a well-known fact that nine-tenths of the corporations doing business in this District are organized under the laws of Virginia or West Virginia, or some of the other States. All our steam railroads in the District are operated by foreign corporations. Nearly all of our street railroads are controlled and practically owned by a Virginia corporation. All these corporations are here " by sufferance " in the same sense in which the defendant may be said to be here.

The States undoubtedly have the power to exclude foreign corporations altogether. Doubtless Congress has the same power in this District, but is it not too plain for argument that when a foreign corporation lawfully establishes its business and acquires property in this District it is entitled to the same protection as corporations organized under the laws of the District? Might it not as well be said that a citizen of New York who comes here is without the protection of the Constitution?

The only case we have found in which such a question as this has been raised is the case of *Chicago & Northwestern Railroad Company* v. *Dey,* 1 L. R. A. 744–752–754. See the opinion in that case.

2. The validity of the act upon which this suit is based depends, not upon whether the average expense of the defendant per subscriber is within the rates fixed, but upon whether

the most efficient equipment and service, such as are received by the complainants in this case, can be rendered at those rates.

3. The act is void because it impairs existing contracts. This question is presented in two aspects. In the first place, with each of its subscribers the appellee had written contracts, which by their terms were to continue in force until terminated by a ten days' notice given by one party to the other. A number of the complainants brought their suits without giving any such notice, and the contracts are, therefore, still in force, unless terminated by this act of Congress. A clearer attempt to " impair the obligation of a contract " by a legislative act could hardly be imagined.

In the second place, the Government itself, through its several departments in Washington, and through its agent, the District of Columbia, entered into a number of such contracts with the defendant. With a large number of its telephones, the Government, like the complainants in this particular case, had extra equipment, and had contracted accordingly to pay an extra rate, the total annual price which the Government agreed to pay for this service with extra equipment in many cases running as high as from $140 to $500, the last-mentioned figure being the rate paid by the Government Hospital for the Insane.

Thus, by this legislation, Congress attempts, not only to impair the obligation of contracts between others, but to relieve the Government itself from its own obligations, not as to the past merely, but indefinitely throughout the future.

Opposing counsel claim that Congress has the right to impair the obligation of any contract whatsoever in this District and, necessarily, everywhere else under the exclusive jurisdiction of Congress. They say that the power of Congress to impair the obligation of contracts, *directly or indirectly,* " is now too well settled to admit of further discussion."

The cases in the Supreme Court of the United States which they cite in support of this proposition in nowise sustain their contention. Those cases merely hold that where

Congress is given the power to declare what constitutes a legal tender, or to enact a bankrupt law, or to declare war, or to enact a statute of limitations applicable to suits transferred from the State courts to the courts of the United States, the fact that the payment of a debt in such legal tender, or the discharge of a bankrupt, or the continuance of hostilities, or the expiration of the time within which a suit may be brought, will *indirectly* prevent a creditor from collecting a debt, and so will, in a certain sense, impair the right to enforce a contract, will not prevent Congress from exercising that power. But the court is careful to place these decisions on the ground that the power to do the thing which so indirectly impairs the obligation of a contract is given to Congress by the Constitution.

But the law which is under consideration here *directly* impairs the obligations of the contracts between the defendant company and each of its subscribers, including the Government itself. If the act had said in so many words, " Telephone subscribers who have agreed to pay $125.00 or $100.00 per annum, shall hereafter, notwithstanding their contracts, pay not more than $50.00," the effect as to contracts in force at the time would be precisely what the effect of the law as it stands will be if the position of the complainants here is sustained by the court. See *Legal Tender Cases,* 12 Wall. 457; *Union Pacific Railroad Company* v. *United States —* the *" Sinking Fund Cases,"* 99 U. S. 700; *Calder* v. *Bull,* 3 Dall. 388; *Fletcher* v. *Peck,* 6 Cranch, 87; *The Territory* v. *Reyburn,* 1 Kan. 551–557.

4. The act is void because the rates were fixed, not only without giving the defendant an opportunity to be heard, but without even any preliminary *ex parte* investigation as to what would be reasonable rates for the service required of the defendant. See *Chicago, etc., Railway Company* v. *Minnesota,* 134 U. S. 418.

Surely it must, at least, be admitted that rates fixed without notice to the party affected, and without even a one-sided investigation into the matter, are not to be held presumptively reasonable till shown beyond a reasonable doubt to be unjust.

Counsel for the appellants insist that we are wrong in our contention that the doctrine so often laid down by the Supreme Court, that doubts as to the constitutionality of State legislation or of acts of Congress will be resolved in favor of the validity of such laws, applies where questions of law only are involved. Yet it is to be observed that, of the five cases cited on this point by counsel for the appellants, three — the cases in 12 Wall. 531, 19 Wall. 666, and 173 U. S. 615 — involve questions of law only. In the other two cases — *Smyth* v. *Ames,* 169 U. S. 466, and *San Diego Land Company* v. *National City,* 174 U. S. 739 — the State statutes involved provide for a regular judicial proceeding, and there actually was such a proceeding before the rates complained of in those cases, respectively, were fixed.

It may well be that when a legislature has deferred the fixing of rates to a commission or board of some kind, and that tribunal, before fixing them, has fully heard and considered all that the public-service corporation affected can offer by way of evidence or argument, the courts will require a very clear showing that the rates are unjust before they will interfere. But such a doctrine can have no application where the commission or board acts without notice to the party chiefly concerned; and when the legislature itself undertakes to arbitrarily fix the rates, without any investigation or hearing whatever, its act is as void, we submit, as it would be if it undertook to take land for public use and, at the same time, fix the price to be paid for it.

5. A telephone exchange supplying reasonably efficient service to all parts of the District of Columbia cannot be maintained and operated without loss at the rates fixed by the act of June 30, 1898. We do not concede that, in considering the validity of the statute in question, the particular situation of the appellee should be dismissed from consideration. Appellants contend that, even if appellee will necessarily sustain a loss by doing business at the statutory rates, it must accept those rates because it is said that some other company, with different apparatus, could render the service required and make a reasonable profit. If the case required

it, we should insist that, since the exchange operated by the defendant is the only exchange plant that has ever been established in the District, and since no other exchange could be established without affirmative action on the part of Congress, it must be assumed that the act of June 30, 1898, was intended to apply to the defendant company and to no other person or corporation. But this, as it seems to us, is a moot question, because, as we confidently submit, the evidence in this case upon which we rely to show that the act in question, if enforced against the defendant company, would be a virtual confiscation of its property, also demonstrates that the act would have the same effect upon any other company that would undertake to render service of the same class to the people of the District of Columbia. Under the conditions that exist in this District, it is impossible to operate a telephone exchange connecting together subscribers all over the District for an average annual compensation of considerably less than $50 per subscriber. The evidence, which shows that the defendant would be ruined by attempting to carry on its business at the rates fixed by the statute, will show that the business cannot be carried on at all without a loss unless the rates are far higher than the maximum rate allowed by the act of Congress in question.

6. The business of the defendant has been economically conducted and its books of account have been properly kept. It is established by the uncontradicted evidence in the case that the defendant has conducted its business in as careful and economical manner as possible; that the heads of its several departments are faithful and competent men; that in making all its purchases of material, wherever competition is possible, it buys from the lowest responsible bidder; that in its purchases, where competition is impossible, it gets as low rates as any other purchaser, and has a special contract by which, if prices go down, it is to get the benefit of the reduction, and if they go up its rates are not to be affected; that all material is carefully accounted for, being charged to the storekeeper when received by him and duly receipted for by the heads of the departments to whom it is delivered,

and generally that every possible safeguard is thrown around. its financial transactions, so as to keep its expenditures at the lowest point consistent with good service.

7. The books of account of the defendant and the original. vouchers have been thoroughly examined by the most competent experts in the United States, and the details of its receipts and expenditures for a period of nearly seven years are before the court.

8. The books of account of the defendant and the statements made up from them by the accountants show that the regular and ordinary expenses of operating and maintaining the defendant's exchange require a greater expenditure per telephone than even the maximum rate fixed by the statute.

9. The public and the stockholders of the defendant company are not the only parties interested; but, in fact, those having the most direct and immediate interest are the bondholders. They have the first lien on the property of the defendant. If it is ruined, their security is gone. The bonds have been on the market for several years, and in the ordinary course of business have gone into the hands of many investers. Yet, though their rights are paramount, they have never been heard — have never had an opportunity to be heard. As to their rights, see *Smyth* v. *Ames,* 169 U. S. 466; *Chicago, etc., R. Co.* v. *Dey,* 35 Fed. Rep. 866, 879.

10. As to the claim that, with lower rates, there will be more subscribers, and that, as the number of subscribers increases, the cost per subscriber decreases: The complainants urge that, even if with about 2,200 subscribers, the statutory rates are too low, yet that, if those rates were adopted, there would be a great rush of new subscribers, increasing the total number to 8,000 or 10,000, and that this great increase in subscribers would enable the defendant to profitably carry on a business that might not be profitable with but 2,200 subscribers.

Counsel do not tell us how the defendant is to be made whole for the loss it would sustain, even on this theory, during the interval between the enactment of the law and the taking into the exchange of these thousands of new sub-

scribers; nor do they make any provision for the difficulty that would arise if the defendant should accept the statutory rates depending upon this tremendous influx of new subscribers, and should be disappointed in such expectation.

It seems reasonably clear that rates which a public-service corporation is bound to accept instanter must be such as are reasonable at the time they go into effect, but we need not discuss that question, because it has been settled for us by the Supreme Court in *Smyth* v. *Ames*, as that case is reported in 171 U. S. 361. In delivering the opinion there reported, it is said:

" Of course the reasonableness of a schedule of rates must be determined by the facts as they exist when it is sought to put such rates into operation."

But the evidence in this case shows beyond peradventure that, as the number of subscribers in a telephone exchange increases, the cost per subscriber does not decrease, but increases. We do not mean to say that this holds good in every exchange and with every increase, but that in the long run, and wherever the increase is substantial, this is the necessary result. The history of this exchange in Washington shows that that has been the result here.

11. As to the evidence relating to telephone service and rates in other cities: Avoiding the District of Columbia and the conditions under which telephone service must be rendered here, the complainants' counsel proceeded to journey from city to city, starting at Detroit and winding up at Norfolk, taking testimony about telephone rates and plants in other cities. All this evidence came in subject to objection They seemed to take it for granted, and, indeed, in their brief in this court, they now contend that when they have shown that in some other place some telephone company is doing business and charging rates less than those fixed by this act of Congress, the presumption arises, without evidence, that these companies are doing business at a profit, and that the burden is cast upon the defendant to show that the conditions under which such companies render service are so different from the conditions under which the busi-

14

ness must be carried on in the District of Columbia, that rates which will pay in these cities will not pay here.

On this point we do not agree with our opponents. After evidence so full and satisfactory, showing that, in the District of Columbia, efficient telephone service cannot be rendered at anything like the rates fixed by the statute, has been placed before the court by the defendant, it certainly cannot be that that evidence is met or its weight affected by simply showing that in certain cities rates as low or lower are in force. Of what avail, for instance, would it have been if the complainants had shown, as they easily might, that in a hundred small towns throughout the United States telephone service is furnished for from ten to twenty dollars per annum. To be of any force, we submit it would have to be shown that telephone service is rendered in other cities, *under like conditions and at a profit,* at rates not exceeding those fixed by this act of Congress. See *Smyth* v. *Ames,* 169 U. S. 466.

12. The question before the court is, not whether the existing rates are too high, but whether the rates fixed by the statute are too low. The average rates under the statute are only about one-half of the average of the existing rates, and, while we deny that, under existing rates, the defendant can earn anything more than a fair compensation for its service, as we think has been shown above, yet it is apparent that showing that the present rates are too high is a very different thing from showing that the rates fixed by the statute are not too low. Indeed, on its face, the proposition that the defendant, while limiting its dividends for the fifteen years during which it was in existence, from August, 1893, to November, 1898, to an average of less than 3 per cent. per annum, should, in fact, have been making the enormous profit claimed, is incredible. But, certainly, it is an immaterial question here whether the defendant, during those fifteen years, earned more than a fair profit. If the statute had left to this court, or to a board or commission of some kind, the investigation of this subject and the determination of what are proper rates, then it would have been important

to inquire whether, under existing rates, more than a reasonable profit can be earned. But this court is given no power to determine what are fair rates. It has no power to consider that subject. It cannot inquire whether more than a fair profit is now being earned, and, finding that it is, reduce rates so that only a fair profit shall result. It has simply to inquire whether, at an average rate of less than $50 per annum, the reasonable expenses of carrying on the business can be met and a fair compensation in addition realized by the defendant.

13. We are not concerned in this case with the financial operations of the defendant prior to July 30, 1898, except as they may have some bearing on the question of what would be fair rates on and after that date. It is of no consequence, we submit, whether Mr. Maynard and his successors, between 1878 and August 1, 1883, made dividends or what amount of capital they invested, and so it is of no consequence what proportion of the proceeds of the defendant's bonds were expended in the District of Columbia and in Baltimore. It is of no consequence whether the abandonment of the solid system of conduits and the substitution of the drawing-in system was a wise measure or not. It is of no consequence, indeed, what proportion of the defendant's plant, as it stood when the act in question was passed, had been paid for out of earnings or out of bonds or by contributions from the stockholders. There was, on that day, a certain plant in existence here furnishing telephone-exchange service to the public, and the only question, we submit, is whether, at that time, with the plant as it stood, the service required could be rendered at the statutory rates and leave a reasonable profit to the defendant. If the whole plant had been obtained by some fraud or trickery, and had not cost the defendant a cent, the question would be precisely the same. We are not concerned here with the question how the plant was procured, but with the question of what it will cost to operate it.

14. The evidence as to what is the necessary cost of building and of operating and maintaining such an exchange in

Washington all points in one direction.  Nowhere will be found the testimony of any witness, who knows what is required here, that the rates fixed by this statute are not impossible.

It is a rule of courts of equity where questions of fact have been referred to a master (or an auditor) to presume, in the first instance, that his findings as to such questions are correct.  The learned justice who decided this case in the court below, instead of referring it to an auditor himself, practically performed the duties of a master.  The result was that the court reached the conclusion that, beyond all reasonable doubt, the defendant can do business at the rates fixed by this statute only at a loss.  This finding, we submit, should have, at least, the benefit of that presumption in its favor which would obtain if the case were on hearing on the report of a master.  It is impossible, in an appellate tribunal, to fully present the many details of the evidence in such a case as this.  It is impossible that an appellate court should take the time to enter into all these details; yet this is a case in which everything depends upon the details.  Two accountants of the highest standing and of unquestioned probity, having found from an examination, occupying many weeks, that the expense attending the operations and maintenance of the telephone exchange in the District will greatly exceed the rates fixed by this statute, even without any allowance for depreciation, the complainants, if they believed this conclusion to be incorrect, should have given the court the benefit of the results of a similar examination reached by competent accountants selected by themselves.  Having failed to do this, and the conclusions of the accountants having been confirmed after a long and patient investigation by the court below, the members of this court should not be asked to perform themselves the duties of accountants, not only as to the business of the defendant company, but of a dozen other companies in the United States and Canada, but the decree below should be affirmed because it has not been shown to be wrong.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. No objection was taken to the bill in the court below for want of jurisdiction, and all the suits depending upon this, save one, were brought upon the assumption that the appropriate remedy was through appeal to the restraining power of a court of equity. It seems that one party, similarly situated, did file a petition for a writ of *mandamus,* which was denied.

It is true that the learned justice who presided at the hearing of this cause expressed the opinion that the proper remedy was by *mandamus,* but he did not dismiss the bill on that ground. He proceeded to consider the case on its merits, and dissolved the injunction and dismissed the bill because he found the rates imposed by the statute to be unreasonably and oppressively low.

Notwithstanding that expression of opinion, the appellee has declined to raise the question of jurisdiction on this appeal by suggestion even, and has confined itself to the main question. The case has been depending since July 14, 1898, and the parties have incurred great expense in taking a mass of testimony that covers about 1,100 pages of the printed record.

Taking all of this into consideration, as well as the technical character and limited scope of the action of *mandamus,* we are not inclined to raise the question of jurisdiction of our own motion, notwithstanding we might find, upon consideration, that there is an adequate and complete remedy at law for the right sought to be enforced.

2. In respect of the nature of its use there would seem to be no ground for distinction between the business of a telephone exchange and that of a telegraph or transportation company. It likewise serves and promotes the public interest, and, moreover, occupies and makes use of the public streets and highways by the express or implied permission of the State.

The regulation of callings affected with a public interest, including charges for services rendered, is an undoubted

function of the legislative department, and the courts have no right to inquire into the amount of information possessed by the legislative department or to pass judgment upon the motives that may have prompted the exercise of its powers. Consequently we must pass by as irrelevant the argument on behalf of the appellee, founded on the journals of Congress and proceedings of committees of investigation, to the effect that the regulation in question was hastily adopted as a " rider " upon a general appropriation bill, without notice .to or hearing of the defendant, without knowledge of the conditions of its service and in disregard of its interests and rights.

The exercise of the power of regulation was not dependent upon notice and hearing, and we are bound to presume that Congress acted with due knowledge and fair consideration of all the facts and circumstances of the situation which it undertook to effect.

3. On the other hand, it is equally well settled that, whilst the legislative power is inherent and its exercise a matter of wide discretion in respect of the regulation of the conduct and charges of a business affected with a public interest, the one is not paramount and exclusive, and the other is not so conclusive as to preclude judicial inquiry into the effect of a given regulation upon the substantial rights of property of the persons affected.

The courts will make this inquiry and will forbid enforcement when it plainly appears that the regulation violates a binding contract, or is tantamount to the deprivation of property without due process of law, or to its taking for public use without just compensation. *San Diego Land Company* v. *National City,* 174 U. S. 739, 754, and cases cited.

4. It is unnecessary to consider whether Congress, in the exercise of its plenary power as the sole legislative authority in and for the District of Columbia, is under limitation in respect of power to impair the obligation of contracts in the sense that the same is denied to the States by express provision of the Constitution. No such question is presented

by the record.  The defendant holds its franchise as a corporation by grant of the legislature of the State of New York.

Thus incorporated, it came to the District of Columbia and commenced a business of a public nature without invitation or express permission.

Congress entered into no contract with defendant after its entry and has conferred no franchise upon it; nor has it attempted to annul or curtail the corporate franchise held under the authority of the State of New York.

No implied contract, having legal obligation, can possibly arise out of defendant's entry and commencement of business without obstruction or apparent objection.  The United States are under no estoppel.  We have seen, in the provisions of statutes heretofore quoted, that each time the Commissioners of the District have been authorized to permit the laying of conduits in the streets and the erection of polls in public alleys it has been with the express reservation of the right of revocation " at the will of Congress and without compensation."

Even if the defendant had been incorporated by act of Congress and specially granted the right to carry on business in the District of Columbia, it would, probably, without a reservation similar to the foregoing, and certainly with it, be subject to repeal or revocation at will.  In such event all that would remain to the representatives of the corporation would be the right to take away its cables, poles and other movable property for utilization elsewhere or in some other way.  And Congress might also grant a franchise to some other corporation with the right to take and use the cables and poles of the defendant, provided that provision be made at the same time for the regular ascertainment and prompt payment of just compensation for the property taken.  *Greenwood* v. *Freight Company,* 105 U. S. 13; *Thornton* v. *Marginal Freight Company,* 123 Mass. 32.

5. Being a foreign corporation doing business in the District of Columbia upon sufferance — a mere occupant at will, without the protection of contract or vested right —

the defendant could be either expelled or permitted to remain upon any conditions whatever, at the will or pleasure of Congress. Power in this respect is, at the least, co-extensive with that established beyond all question as belonging to the legislatures of the States. *Paul* v. *Virginia,* 8 Wall. 168; *Waters-Pierce Oil Company* v. *Texas,* 177 U. S. 28.

Congress has not exercised this undoubted power of expulsion in the case of the defendant or commanded it, by name, to perform its accustomed services at the fixed rate as the condition of its remaining and doing business in the District. The regulatory act is general in its terms and applies to " any person or any telephone company doing business in the District," but the defendant is the only person, or company so engaged, and, for the time being at least, the regulation can only have application to it. The substantial effect of the act is to impose the statutory rate as the condition of further toleration. The act is mandatory and the intent of Congress is practically the same as if it had said to the defendant: " Accept this rate or withdraw from the District." Congress could not, and did not, undertake to compel the defendant to remain in occupation of the field of operations and carry on business at the imposed rate against its will.

If the defendant, convinced that the rate fixed by law is ruinously low, had suspended its business and abandoned all operations within the District, Congress would have no power over it other than to compel it to remove its obstructions from the streets and other public places. Nor would the courts, in such event, have any power to compel the defendant to give its services to any person. But the defendant cannot remain and carry on its former business in defiance of the law. Persisting in its business, it must be regarded by the courts as accepting the condition and coming under obligation to perform its services at the statutory rate. So persisting and at the same time refusing obedience, it is within the judicial power to compel defendant to observe the rate fixed by Congress until such time in the future as it may voluntarily withdraw from business or Congress may relieve.

According to this view of the defendant's rights and obligations, the preliminary injunction was properly granted, and should have been perpetuated upon final hearing, with the limitation before suggested.

6. It has been further contended on behalf of the appellee that the act of Congress is unconstitutional, because it impairs the obligation of contracts entered into by the defendant with other persons. If the act of Congress undertook to annul or destroy contracts in the nature of grants of private property or vested interests, the power might well be denied, not by virtue of any express prohibition of power to impair the obligation of contracts, but because such an act might be regarded as the usurpation of judicial power, as well as the deprivation of property without due process of law, or taking the same without provision for just compensation. No such contracts are in question here. All other contracts of the defendant, relating to loans, supplies, royalties and services, are incidents of corporate existence and franchises. All persons contracting with a corporation in these particulars do so subject to the dissolution of corporate existence or the termination of special franchises by limitation, by judicial decree or by repeal where that power exists. *Mumma* v. *Potomac Co.,* 8 Pet. 281, 287.

All that remains of such contract obligations is the right in equity to their enforcement, when practicable, against the available property of the corporation in the act of winding up its affairs.

7. What we have before said respecting the power of Congress to prescribe an arbitrary service rate as the condition of defendant's right to do business in the District has been upon the assumption, as charged in the answer, that the rate is ruinously low, that is to say, wholly insufficient to meet the necessary and legitimate expenses of the services to be performed.

Due respect to the legislative department, whose action is assailed, and perfect harmony with the principles upon which the right of judicial inquiry and interference in such instances is founded, require that one invoking judicial relief

shall show beyond reasonable doubt that the enforcement of the regulation will be destructive of property. *San Diego Land Co.* v. *National City,* 174 U. S. 739, 754, and cases cited.

Moreover, the facts from which the conclusion is to be deduced are complex and peculiarly within the knowledge of the party complaining. If statements and calculations of cost, expenditure and so forth are misleading or untrue, they often cannot be contradicted, and if uncertain and involved, rarely admit of elucidation by the opposing party.

In considering the evidence and determining whether the compensation prescribed by law is destructive of property, the basis of estimation in a case like this will ordinarily be the reasonable, actual value of the property used in the business, cost of maintenance and the expense of carrying on the business properly. *San Diego Land Co.* v. *National City,* 174 U. S. 739, 755, 757. In the language of Mr. Justice Harlan in that case: "What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used by the public. The property may have cost more than it ought to have cost, and its outstanding bonds for money borrowed, and which went into the plant, may be in excess of the real value of the property. So that it cannot be said that the amount of such bonds should in every case control the question of rates, although it may be an element in the inquiry as to what is, all the circumstances considered, just both to the company and to the public."

The basis of actual value is peculiarly appropriate in this case.

As before stated, the defendant corporation was organized for the express purpose of acquiring and consolidating the business of separate organizations operating in Maryland and the District of Columbia. Its capital stock of $2,650,000 was not issued for money subscribed, but in payment for those properties; $1,900,000 was passed to and divided between the Maryland company and the American Bell Company, and $750,000 was delivered to the National Capital Company.

The actual value of the property received in exchange, as shown by the statements of the experts and derived from the defendant's books, was, in Maryland, $345,045.24, and in the District of Columbia, $168,465.14. Differences between these values and the face value of stock transferred are represented solely by arbitrary valuations of the franchises acquired. What these franchises may have consisted of in Maryland does not appear. There was no franchise acquired in the District of Columbia, and all that could be acquired in addition to the tangible property of the vendor company was what may be called the " good will " of an established business.

Since the aforesaid purchases, the defendant has issued and sold 6 per cent. bonds of the face value of $500,000. The general telephone business has been extended in Baltimore and to many towns in Maryland, as well as to some portions of West Virginia, and these have been connected with each other and the main offices. Considerable extensions and changes have been made in the plant in the District of Columbia. During the years intervening between the dates of purchase aforesaid and the beginning of the fiscal year in 1898, great expenses, including interest on bonds, have been paid, and regular appropriations to sinking fund have been made. Something has been carried to surplus, and average dividends of a little more than $2\frac{1}{2}$ per cent. have been paid on the full amount of the capital stock.

A very great if not insuperable difficulty in arriving at an accurate calculation of the legitimate cost of the service in the District, which is represented by an exceedingly high figure as compared with other telephone exchanges throughout the country, lies in the fact that it is a branch only of the wide extended business of a single owner. On the books, 40 per cent. of the bonds issued is charged against the District plant, and the latter is likewise charged with 40 per cent. of the general expenses of the company, as well as with its proportion of annual interest and sinking fund appropriations.

The evidence does not show that 40 per cent. of the bond

sales was actually expended in betterments in the District, nor does it show that 40 per cent. of general expenses is the real and just proportion to be borne by the Washington plant. Baltimore is a considerably larger city than Washington, and has in operation about 25 per cent. more telephones, with toll-line connections with nearby towns and villages.

Then there are local exchanges in Maryland at Cumberland, Hagerstown, Frederick, Westminster, Annapolis, Mt. Washington, Lutherville, and in West Virginia at Martinsburg. Besides, all of these points are connected with each other by toll lines, and each has additional lines to smaller adjacent villages where no exchange is maintained.

Washington is connected with Baltimore and also, it seems, with Alexandria and Waterloo, Va. The general officers of defendant, including superintendents of construction and of inside and outside maintenance, live in Washington, and considerable items of general expenses consist in traveling expenses caused by the wide dispersion of the business under their charge.

Turning now to the annual expenses of the Washington plant, including the foregoing proportion of general expenses, we find that Haskins, the expert accountant who testified for the defendant, estimates them for the six years from 1892 to 1897, inclusive, as averaging $66.57 per telephone. In estimating annual expenses, as for maintenance and the like, he includes large annual rentals for receivers and transmitters paid to the American Bell Telephone Company, which appears to own a majority of defendant's capital stock under the old contracts of 1883 and confirmations, 40 per cent. of annual interest upon bonds and some miscellaneous interest, and 40 per cent. of annual appropriations to the sinking fund. In addition he charges a great proportion of the cost of additional underground construction and the substitution of improved appliances and so forth, together with all cost of subscribers' connections.

The most of these inclusions as charges to current expenses of maintenance we regard as inadmissible. Whether these may be admissible as between stockholders and corporation is not the question.

The interests of the public are here involved and a very different question is presented when they are relied upon as a ground for the resistance of the right of public regulation.

It is plain that interest and sinking fund items are not chargeable as expenses, and we understand this is virtually conceded. There is no proof that justifies the payment of the annual rentals to the parent Bell Company. Patents existing when the 1883 contracts were made have necessarily expired, and the evidence shows that instruments of equal efficiency can be purchased in open market for a sum slightly in excess of one year's rental charge. The right to charge certain improvements to maintenance is more doubtful. Probably the cost of connecting new subscribers may be charged to expenses, because when discontinuances are made the connections become valueless. At the same time, as the majority are practically permanent and productive of revenue, some division of charge between construction and maintenance would seem equitable. Whatever is necessary through ordinary wear or accident to keep the plant in good, serviceable condition is properly chargeable to expenses. On the other hand substitutions of improved appliances for others in serviceable order in order to obtain increased efficiency, as well as increase of plant, would seem to be properly chargeable to construction. It appears that the defendant had, some years ago, laid certain cables in the underground conduit after a plan called the "solid system," at an expense of about $115,000. An objection to this system was that cables could not be drawn out and repaired or substituted, and another, that additional cables could not be added. Underground construction is expensive, and particularly so where asphalt pavement must be removed and relaid.

This old cable was not abandoned because worn out or incapable of working efficiently. It was not torn up, but a new excavation was made alongside, in which sections of terra cotta conduits were laid. These separate conduits would admit cables composed of 50, 100 and 150 wires, as were then manufactured. Expensive manholes were constructed at intervals, so that the lead-covered cables could be drawn

through the conduits as required for construction or repair. The new subways were provided with a considerable amount of extra conduit, so as to permit the growth of the exchange to about double its then number of subscribers.

Under the conditions stated this new subway, with its extra conduits, should have been charged to construction. This we think is in accordance with the doctrine enounced by the Supreme Court of the United States in the only case in which the question seems to have been considered — *U. P. RR. Co.* v. *United States,* 99 U. S. 402, 420.

The rule, in our opinion, as between corporation and the public, would be the same that seems to apply in the case of the conversion of a horse railway into one operated by cable or underground electric current, or the erection of extra tracks by steam railway companies.

The defendant also claims the right to charge against annual expenses from 10 to 15 per cent. of value of plant on account of depreciation, although this item does not appear in the figures of the expert Haskins.

We cannot agree to this proposition. It is covered by the regular annual charge of maintenance, which includes all repairs and substitutions of defective and worn-out materials in order to maintain efficiency of operation.

It is impracticable from the evidence to say just what reductions may be made for any one of the years given, on account of the cost of the new underground construction.

Averaging it, with considerable uncertainty, and making the other deductions mentioned, the average annual expense per year, for the six years, would be less than $50 per telephone subscriber, leaving a possible margin for dividends of from 2 to 3 per cent. upon the actual cost of the plant, which is estimated at from $428,000 to $450,000.

The expenses varied considerably during the years embraced in the statement, showing a very great excess for 1897 over the average. This has been ascribed largely to extraordinary repairs made that year on account of delay in permission of the public authorities to make improvements. It would seem that considerable part of this, but how much is

unascertainable from the evidence, is due to the improved conduit system before mentioned.   Moreover, the president's report to stockholders, under date of January 31, 1898, shows an increase of 783 poles in the erections for the year.

Coming down to the evidence of expenditures for the first three quarters of the year 1898, Haskins shows total expenses for the whole year,— estimating the coming quarter at the same proportion,— to amount to $151,371.57, which is less than the expenditures of 1897.

Continuing his system of charging expenses, he estimates the cost for the year per telephone — taking 2,126 as the average number — at, say, $71.25.

Deducting interest, sinking fund and rentals as not properly chargeable to expenses, the cost per telephone would be about $53, making expenses exceed income, at the $50 rate, about $6,500 for the year.

Appellants contend that this difference would be more than set off by deducting from salary charges the traveling expenses of officers and the unnecessary cost of services in general.   They would deduct for the former $4,106.74, and for the latter $19,248.31.

This last deduction would embrace the proportion of general salaries charged to the Washington plant, which amounts to $10,918.40, with a reduction of, say, $9,000 from local expenses as excessive and unreasonable to that extent.

That there should be some deduction on account of these expenses seems reasonable, but what that deduction should be does not satisfactorily appear from the evidence.   Appellee's statement of the expense per telephone of salaries and wages alone is at the rate of $37.70 per year in the District of Columbia.   This is much greater than the total expense per telephone in many other places given in the testimony.   For example, Toronto, Canada, with 5,932 stations, estimates expenses at $25.26 per station; Detroit, Mich., 4,636 stations at $20.95 per station.   Some smaller cities, none of which, save Grand Rapids, Mich., have more telephones than Washington, range from $12.50 to $24 per station.   Conditions are frequently so different that the expense of operation in one

city does not furnish a safe rule of comparison for others. Conditions in Washington are peculiar in that its streets and avenues are much wider than those of others brought into comparison, and the average distance required to reach subscribers is much greater. Besides, conditions of construction are more onerous in several respects.

At the same time it does not seem reasonable that these conditions are sufficient to account for the great difference in expense shown in the several tables of charges, particularly those of salaries and wages per telephone.

Again, it does not appear what proportion of expense is due to the outside connections. There are also a considerable number of what are called private lines, that do not enter into the general service. What figure these ought to cut in the calculation of expenses does not plainly appear to us.

As the judgment appealed from must be reversed upon the ground first stated, regardless of the fact that the statutory rate might be most unjust, we have not made up a particular statement of all the many items entering into that consideration.

If the case turned upon this point we would have great difficulty in determining from the mass of figures and opinions in evidence what particular rate would cover legitimate expenses and afford any return for the money invested, and would feel a strong inclination to remand the cause for the introduction of additional evidence upon some of the points of difficulty that have been suggested, and with direction for reference to the auditor to find and report all of the necessary facts with all necessary or important computations and estimates.

The most that we now feel called upon to say is that our examination of the evidence does not satisfy us that the necessary effect of the enforcement of the rate will be destructive of defendant's rights of property.

For the reasons given the decree will be reversed, with costs, and the cause remanded for the entry of a decree granting the injunction in conformity with this opinion.

*Reversed.*

Mr. Chief Justice ALVEY concurs in the judgment.