# DISTRICT OF COLUMBIA v. GEORGETOWN GAS-LIGHT COMPANY.

---

STATUTES; TAXATION; GROSS EARNINGS.

1. It is only where a statute is ambiguous that, in construing it, prior statutes relating to the same subject may be examined and considered to determine the legislative intent. (Following *Holden* v. *United States*, 24 App. D. C. 335.)

2. In assessing a company engaged in the manufacture and supplying of illuminating gas, under par. 5, sec. 6, of the act of Congress of July 1, 1902 (32 Stat. at L. 617, chap. 1352), providing that such companies shall pay a tax of 5 per cent per annum upon their gross earnings, the company will be allowed to deduct from the gross receipts

from its sales of gas and by-products, the amount it has expended
for the raw materials from which the gas was manufactured, when
the money spent for the raw materials was taken from the company's
capital, and from such part of its earnings of previous years as re-
mained after the payment of all charges, including taxes, during the
year in which the earnings accrued.

No. 2897.   Submitted February 23, 1916.   Decided April 10, 1916.

HEARING on an appeal by the defendant from a judgment of
the Supreme Court of the District of Columbia in an action to
recover taxes alleged to have been paid under duress, the court
having overruled a demurrer to the declaration and the defend-
ant having elected to stand on its demurrer.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a judgment in the supreme court of
the District, entered for the Georgetown Gaslight Company,
plaintiff below, against the District of Columbia for the sum of
$3,241.49 and interest.   The action was for the recovery of
money alleged to have been illegally exacted by the District of
Columbia from the company as part of a personal tax due by
it for the year ending June 30, 1913, under the act of Congress
of July 1, 1902, which imposes an annual tax of 5 per cent on
the gross earnings of gas companies in the District.

It is alleged in the amended declaration upon which the case
comes up that the taxes illegally exacted were imposed by the
District of Columbia under the provisions of that part of para-
graph 5 of section 6 of the act of July 1, 1902 (32 Stat. at L.
617, chap. 1352), which reads thus:

"Par. 5.   Each national bank as the trustee for its stock-
holders, through its president or cashier, and all other incorpo-
rated banks, and trust companies, in the District of Columbia,
through their presidents or cashiers, and all gas, electric light-
ing, and telephone companies, through their proper officers,
shall make affidavit to the board of personal tax appraisers on or
before the 1st day of August each year as to the amount of its

or their gross earnings for the preceding year ending the 30th day of June, and shall pay to the collector of taxes of the District of Columbia per annum on such gross earnings as follows: Each national bank, and all other incorporated banks, and trust companies, respectively, 6 per cent; each gas company, 5 per cent; each electric lighting, and telephone company, 4 per cent. And in addition thereto the real estate owned by each national or other incorporated bank, and each trust, gas, electric lighting and telephone company in the District of Columbia shall be taxed as other real estate in said District: *Provided,* That street railroad companies shall continue to pay the 4 per cent per annum on their gross receipts and other taxes as provided by the existing law, and insurance companies shall continue to pay the 1½ per cent on premium receipts, as provided by section 650 of the Code of the District of Columbia [31 Stat. at L. 1291, chap. 854]. That so much of the act approved October 1, 1890, entitled "An Act to Provide for the Incorporation of Trust, Loan, Mortgage, and Certain Other Corporations within the District of Columbia' [26 Stat. at L. 625, chap. 1246] as is inconsistent with the provisions of this section is hereby repealed."

The declaration then contains these material averments: The company on July 16, 1913, made a return for the year ending June 30, 1913, to the assessors of the District of Columbia, of its gross earnings in the sum of $97,719.58; and thereafter the assessor called upon the company for a statement of how it arrived at the sum of $97,719.58. The company furnished the assessor a statement showing that the total sales from gas and its by-products during the year ending June 30, 1913, were $160,939.99, and the cost of the raw materials actually entering into the manufacture of the gas sold was $63,220.41, and that by deducting the cost of the raw materials from the gross receipts the company found and reported its gross earnings as $97,719.58. Thereupon the board of personal tax appraisers levied an assessment against the company on the basis of $160,939.99; and that assessment having been sustained on appeal before the board, thereafter the company tendered to the

collector of taxes of the District the amount of the tax due on the sum of $97,719.58, which he refused to accept, and by letter demanded of the company the payment of $8,047, the amount of tax based on the sum of $160,939.99, the entire assessment against the company for the purpose of the 5 per cent tax under the act of Congress of July 1, 1902, and also a penalty of 1 per cent for default, amounting to $80.47, or a total of $8,127.47.

The declaration also avers, by amendment to the original declaration, that, "* * * the said sum of $63,220.41, money so spent for the said raw materials purchased as aforesaid, was money taken from its capital, which capital was composed in part of such part of its earnings theretofore added to its capital as remained to it after providing for the payment of all charges and expenses, including real and personal taxes for and during the year in which said earnings had accrued, and of dividends on its capital stock."

And the declaration then avers that upon the receipt of the letter from the collector of taxes, informing the company that the bill of $8,127.47 was still unpaid as the personal tax bill of the company for the year ending June 30, 1913, and that unless payment was made by June 15, 1914, the means provided by law would be used by distraint of goods found in the District of Columbia belonging to the company to satisfy this claim, the company, under the threats and duress in that notice, and not of its own free will, but to prevent the seizure of its property, paid the sum of $8,127.47, being $3,241.49 in excess of the amount which the company should properly have paid as its personal tax for the year ending June 30, 1913, and that the District thus accepted and converted this sum to its own use without right and against the will of the company. And the declaration avers that therefore the company is entitled to recover from the District the sum of $3,241.49, as claimed in the declaration.

The appellant filed a demurrer to the declaration which presented to the lower court the question whether the appellee company should have been allowed by the assessor the deduction of

the cost of the raw material used in the manufacture of gas in determining what were its gross earnings. The court overruled the demurrer, and the appellant electing to stand on its demurrer, judgment was accordingly entered for the appellee company for the sum of $3,241.49, with interest, from which judgment this appeal was taken.

*Mr. Conrad H. Syme,* Corporation Counsel, and *Mr. Francis H. Stephens,* Assistant, for the appellant in their brief cited:

*Barry* v. *Mo. K. & P. Rd. Co.* 27 Fed. 1–5; *Belfast etc. Railroad* v. *Belfast,* 77 Maine, 452; *Bouch* v. *Rd.* 4 Ex. Div. 13; *Clarke* v. *Vandalia Co.* 172 Ind. 409, 418; *Colling* v. *R. R.* 54 Conn. 156, 168; *Commissioners* v. *Brush Elec. Light Co.* 204 Pa. 249; *Commissioners* v. *Hamilton Mfg. Co.* 12 Allen, 298; *Commissioners* v. *Pa. Gas Coal Co.* 62 Pa. 241; *Commissioners* v. *Ocean Oil Co.* 59 Pa. 61; *Commissioners* v. *Pa. Gas Coal Co.* 3 Brewster, 107; *Commissioners* v. *United States Express Co.* 157 Pa. 579; *Commissioners* v. *Phil. & Erie Rd.* 164 Pa. 252; *Connolly* v. *Davidson,* 15 Minn. 519; *Corey* v. *Rd. Co.* 29 Beav. 263; *Corey* v. *Londonberry Rd.* 29 Beav. 263; *Detroit, etc. Rd.* v. *Commissioners,* 119 Mich. 132; *Grant* v. *H. & N. H. R. R.* 93 U. S. 225; *Lehigh Co.* v. *Com.* 55 Pa. 448; *Mills* v. *Northern Rd. Co.* L. R. Chap. 621; *Mobile & O. R. R.* v. *Tenn.* 153 U. S. 486; *N. P. R. R.* v. *U. S.* 97 U. S.; *New York, etc. Rd.* v. *Nickols,* 119 U. S. 296–308; *New York* v. *Fulton St. R. R.* 130 App. Div. 791; *New York* v. *34th St. Ry.* 122 N. Y. Supp. 344–346; *Pac. Nat. Bank of Takoma* v. *Pierce County,* 20 Wash. 657-682; *Park* v. *Grant Loco. Works,* 40 N. Y. Eq. 114-121; *Philadelphia Contributorship for Ins.* v. *Com.* 98 Pa. 48; *Philips* v. *Eastern R. R.* 138 Mass. 122; *People* v. *Supervision,* 4 Hill, 20; *People* v. *Roberts,* 52 N. Y. Supp. 859; *Railroad Co.* v. *Railway Co.* 44 Ohio St. 287–315; *Railway* v. *Shinn,* 52 Ark. 93–97; *State* v. *St. Paul Ry.* 30 Minn. 311; *Spreckler Sugar Refining Co.* v. *McMillan,* 192 U. S. 397; *So. Pac.* v. *Com.* 78 Fed. 237–265; *Society for Savings* v. *Coite,* 6 Wall. 594–609; *Sioux City & Pac. Rd.* v. *United States,* 110 U. S.

205–207; *St. John* v. *Erie Railway,* 22 Wall. 136–149; *State* v. *North Pac. Rd.* 32 Minn. 294–295; *Smith* v. *Bates Mach. Co.* 187 Ill. 166; *State* v. *Central Tr. Co.* 106 Md. 268; *State* v. *N. W. Teleph. Co.* 107 Minn. 390; *Union P. R. R. Co.* v. *United States,* 99 U. S. 402; *United States* v. *Kansas Pac. Ry. Co.* 99 U. S. 455; *Van Dyke* v. *McQuade,* 86 N. Y. 47; *Williams* v. *Western Union,* 96 N. Y. 162–191.

*Mr. Wm. G. Johnson* for the appellee.

Mr. Chief Justice COVINGTON, of the Supreme Court of the District of Columbia, who sat with this Court in the hearing and determination of the appeal in the place of Mr. Justice VAN ORSDEL, delivered the opinion of the Court:

The one question presented by the record in this case is whether or not, in assessing the appellee the personal tax on its *"gross earnings"* in accordance with the provisions of paragraph 5 of section 6 of the act of July 1, 1902 (32 Stat. at L. 617, chap. 1352), the assessor, in determining what were the gross earnings, should have allowed the appellee to deduct from the gross receipts from its sales of gas and by-products the amount of the expenditures for the raw material from which the appellee company manufactured its gas, when the money spent for the raw materials was taken from its capital, and from such part of its earnings of previous years as remained after the payment of all charges, including taxes, during the year in which such earnings accrued.

The demurrer concedes the material facts in the declaration. That the expenditure of $63,220.41 was for raw material used in the manufacture of gas must therefore be taken as admitted; also it must be taken as admitted that this money was an expenditure from its capital, which capital was composed in part of its earnings theretofore added to its capital as remained to it after providing for the payment of all charges and expenses, including taxes for the years in which those earnings accrued, and including dividends paid on the outstanding capital stock.

At the argument there was some discussion of the question whether or not the money admitted to have been spent for raw material was in reality "capital" within the proper economic definition of that term.  The determination of that question is not at all necessary in this case.  By whatever term the money expended for these raw materials may be appropriately described, whether it be capital, surplus, or undivided profits, it is admittedly by the pleadings a fund in the hands of the company, composed in part of original capital and in part of the surplus net earnings belonging to the stockholders and added to capital, upon which all charges, including the taxes upon it as earnings, have already been paid and from which the dividends on the shares of stock have also been paid.  The part coming from earnings is therefore a fund belonging to the stockholders, and proper to be used in augmentation of its original capital.

The contention of the appellant is that the term "gross earnings" as used in paragraph 5 of section 6 of the act of July 1, 1902, under which the appellee company was assessed upon its entire gross receipts, is synonymous with the term "gross receipts," and it was urged that the previous legislation by Congress respecting the taxation of corporations in the District of Columbia would show that the terms "gross earnings" and "gross receipts" were used indiscriminately in the existing statute to mean the same basis of taxation.

It is, of course, a well-established rule of statutory construction that prior statutes relating to the same subject-matter may, in a case where the statute in question is ambiguous, be examined to determine the uncertain legislative intent.  But where the meaning of a statute is plain, nothing is left to construction.  So long ago as the case of *United States* v. *Fisher*, 2 Cranch, 358, 2 L. ed. 304, Chief Justice Marshall said respecting the interpretation of a statute:  "If the intention of the legislature be expressed in terms which are sufficiently intelligible to leave no doubt in the mind when the words are taken in their ordinary sense, it would be going a great way to say that a strained interpretation must be put upon them, to

avoid an inconvenience which ought to have been contemplated in the legislature when the act was passed, and which, in their opinion, was probably overbalanced by the particular advantages it was calculated to produce."

And in *Holden* v. *United States,* 24 App. D. C. 335, this court had before it the construction of section 901 of the Code [31 Stat. at L. 1336, chap. 854], relating to deposits of deleterious matter in the Potomac river. It was there contended that a strict enforcement of the statute would practically prevent the manufacture of gas for the use of the city of Washington, and it was also urged that the court must look to the pre-existing law to find the true meaning of section 901. This section was in fact one of six sections, from 896 to 903 inclusive [31 Stat. at L. 1335, 1336, chap. 854], which had the same penalties applied to them by the provisions of section 902. It was argued in that case that an examination of the previous law would show that the intent of section 901 was merely to protect the waters of the Potomac river from such deposits of deleterious matter as would protect fish and spawning. Chief Justice Alvey in that case held, however: "The statute is plain and unambiguous in its terms. * * * Where a statute is of doubtful meaning and susceptible upon its face to two constructions, the court may look into prior and contemporaneous acts, the reasons which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances and the purpose intended to be accomplished by it, to determine its proper construction; *but where the act is clear upon its face, and when standing alone it is fairly susceptible to but one construction, that construction must be given to it."*

Taking paragraph 5 of section 6 of the act of July 1, 1902, in its ordinary sense, it is certainly free from ambiguity. It taxes national banks, other incorporated banks, trust companies, gas companies, electric lighting companies, and telephone companies upon their "gross earnings." It taxes street railroad companies and insurance companies upon their "gross receipts." There is a full recognition by the Congress of a distinction between "gross receipts" and "gross earnings." Is not that distinc-

tion as expressed in this statute a natural and sensible one? Take the case of a bank which lends $100,000 of its capital stock on the 1st day of January, and receives back its $100,000 plus $3,000 in interest on the 1st day of July. It certainly could not have been intended to treat the "gross receipts" of $103,000 as "gross earnings," for if that should be so, the tax upon those "gross receipts" as equivalent to "gross earnings" would be $5,150, or nearly twice as much as the actual interest or profits received. It is obvious then that the expression "gross earnings," when applied to the bank, must mean the gross amount earned from the use of its capital, or the use of such money on deposit with it as it is entitled to treat in the same manner for investment as it does its capital. And if "gross earnings" does not mean "gross receipts" when applied to the bank, of course it cannot mean "gross receipts" when applied to the manufacturing corporation engaged in the production and sale of gas. The one term is applied to both of them to measure their personal taxes, and it must consequently be applied with the same meaning.

It was also urged by the appellant that, after all, "gross receipts" and "gross earnings" are in the broad sense, as applied to business concerns, equivalent terms, and that reading paragraph 5 of section 6 of the act of July 1, 1902, as capable of interpretation without reference to anything except the normal meaning of the words as there used, it must be held that a tax on "gross earnings" and a tax on "gross receipts" are one and the same thing. In support of that proposition they rely largely upon *Union P. R. Co.* v. *United States,* 99 U. S. 402, 25 L. ed. 274, and *United States* v. *Kansas P. R. Co.* 99 U. S. 455, 25 L. ed. 289. But in those cases the "gross earnings" were indisputably the compensation accruing to the company for services performed by the operation of the railroads; and under a statute providing that 5 per cent of the "net earnings" of the company should be annually applied to the payment of certain bonds issued by it, the court had simply to consider in each case what expenditures were properly chargeable against the "gross earnings" in order to arrive at the "net earnings" available for pay-

ment on those bonds and the interest thereon. The question whether an expenditure from railroad capital which might come back to it as receipts must necessarily then be treated as a part of the "gross earnings" of the railroad was not remotely involved in either case.

In fact, all of the Federal cases cited by the appellant, excepting two (and neither of those affecting the point in issue here), were cases in which railroads and their receipts or earnings were involved, and therein lies the misconception of the appellant in this case. It may very well be that "gross earnings" and "gross receipts" constitute precisely the same sum of money with certain sorts of business concerns. A railroad company engaged entirely in the rendition of services for which it receives compensation, and neither producing nor furnishing any tangible commodity to persons as an incident to the rendition of the services, may have as its "gross receipts" and its "gross earnings" precisely the same moneys. But it does not follow that every concern will have as its "gross receipts" and its "gross earnings" precisely the same thing. It would be an economic fallacy to assert that the "gross receipts" of an ordinary manufacturing concern are its "gross earnings." Take the case of an ordinary furniture manufacturing concern. One hundred thousand dollars may be invested in lumber from which, as a raw material, furniture is to be manufactured. A quantity of hardware and paint may be purchased for $5,000, and from that lumber, hardware, and paint may be produced finished pieces of furniture sold by the concern for $150,000. Certainly it cannot be said that the "gross earnings" of that furniture manufacturing concern are $150,000. It has had to take $105,000 of its money from its capital to buy the lumber, hardware, and paint used. From that raw material, with incidental operating expenses for labor and other charges, there has been converted the furniture which has been sold. The "gross receipts" of that concern are $150,000. Its "gross earnings" are $45,000, and its "net earnings" are $45,000 less the operating expenses and other incidental expenditures which have to be made before the actual profit capable to be divided among the stockholders of

the concern is arrived at.   So that, while in the case of certain classes of concerns, such as railroads, producing no commodities, there are only two classes of funds into which the entire receipts are divided, one being the "gross receipts" or "gross earnings," as you please to denominate them, and the other being the "net earnings" after all taxes, charges, and operating expenditures are paid, in those manufacturing concerns which produce commodities for sale by converting raw materials there are, of necessity, three distinct classes of funds into which their entire receipts are divided, "gross receipts," "gross earnings," and "net earnings."   With such concerns it certainly cannot be said that the terms "gross earnings" and "gross receipts" are synonymous.

Such a manufacturing concern as has just been referred to is the appellee in this case.   It is engaged in selling a commodity, gas, which it produces by processes of manufacture by converting raw materials which have been purchased by money from its capital and its net surplus of earnings of former years which has been added to its capital.   Large sums are used to buy those raw materials; and when the gas which is made from them is sold, there comes back to the company as a part of the money received from such sales the capital used in the original purchase of raw material, and when it thus comes back to the company it is returned to capital.   That capital may be at once reinvested in additional raw materials for the manufacture of more gas, and when that gas is made and sold the money the company receives from such sales will again in part be the same capital.   Moreover, if the gas is manufactured and sold with good profit, there may exist in some years a surplus of earnings, after the capital expended for raw materials has been returned to capital, and after the expenditures incident to the development of the commodity from the raw material, and all charges, including taxes on earnings and dividends on capital stock, have been made.   This surplus of earnings it is not unlawful to add to capital, and when thus added it continues as capital.

In the case of *State* v. *Central Trust Co.* 106 Md. 268, 67 Atl. 267, cited in the appellant's brief as authority for the prop-

osition that "gross receipts" and "gross earnings" mean the same thing, it will be found that the opinion does not support that contention. In that case the statute under construction provided for the levying annually of a franchise tax upon certain specified classes of corporations doing business in the State of Maryland, and in one class are included safe deposit, trust, guaranty, and fidelity companies, on which the tax is fixed at "2 per centum annually upon the gross receipts or earnings." The court treated the expression, "gross receipts or earnings," to mean gross profits or earnings. The only question involved was whether the trust company should have returned the *income* from certain classes of its business. The statement of the company, of which the accuracy was conceded by the State, only set out sources of *income or earnings.* It made no pretense to set out *gross receipts,* and all that the State contended for was that certain specific classes of *earnings* which the trust company had not returned be included in its *earnings.* There was not presented to the court the question whether the entire receipts from the business of the company were taxable under the statute by reason of the provision that the tax was fixed at a certain rate upon the gross receipts or earnings. Indeed, it seems to have been conceded that from the very nature of the corporation and the character of the tax imposed, it was a tax upon gross earnings. The word "receipts" seems in fact to have been loosely used in this statute as merely additive to the expression "earnings," but it by no means follows that the words, "gross earnings," were intended to be synonymous with "gross receipts."

But it is said that earnings converted into capital cannot be devested of their character as earnings for the purpose of escaping taxation. And for that proposition the appellants cite to this court the case of *Lehigh Crane Iron Co.* v. *Com.* 55 Pa. 448. It is true that the court in that case said that to permit the company "to escape taxation by calling profits capital is mere legerdemain." But the Pennsylvania statute in that case was one which provided that the *tax chargeable on the capital stock* of a corporation paying a 6 per cent dividend should be ½ mill on each 1 per cent of dividend or profit. The court held

that the words were used to measure the value of the stock, that surplus dividends over 6 per cent were taxable, and that $900,-000 in stock dividends, added to its original capital, could not excape taxation merely because it was described an increase of capital, and not a "dividend or profit." That case does not deal with what are "gross earnings" of an ordinary manufacturing concern. And to assert that earnings by being converted into capital cannot escape all taxation upon earnings is for the case now before us reasoning in a circle.

In *People ex rel. New York C. & H. R. R. Co.* v. *Roberts,* 32 App. Div. 113, 52 N. Y. Supp. 859, where the question was whether a franchise tax upon "gross earnings," under a clause in the statute saying that such earnings "shall include its gross earnings from its transportation or transmission business originating and terminating within the state," the court appropriately described gross earnings. The opinion said: "By 'gross earnings,' it seems to me that the statute means all receipts *arising from or growing out of the employment of its capital,* whether that capital is employed in the transportation or transmission business or otherwise."

In the case of *People ex rel. Brooklyn Union Gas Co.* v. *Morgan,* 114 App. Div. 266, 99 N. Y. Supp. 711, the facts were nearly identical with the case at bar. There the company was required by the tax laws of the State of New York (Laws of 1896, chap. 908) to *"pay to the state for the privilege of exercising its corporate franchises of carrying on its business in such corporate or organized capacity in this State an annual tax which shall be $\frac{5}{10}$ of 1 per cent upon its gross earnings from all sources within this State."* The comptroller of the State of New York fixed the tax on the company, under that statute, at $\frac{5}{10}$ of 1 per cent on the gross receipts. The company was engaged in the business of manufacturing and selling gas. It alleged that at the hearing before the comptroller for the purpose of determining the assessment referred to, it was shown that for the production of such gas it purchased from time to time raw material, consisting principally of coal and oil, which was transformed into the manufactured product, and that at all

times during the year a portion of the capital of the company was invested in such raw material which from time to time was converted into the manufactured product and came back to the company as a cash part of the price of gas sold to the consumer. In reversing the assessment of the comptroller and remitting the matter for a new hearing, it was said in the opinion of the court: "The comptroller has thus fixed the tax, not on the 'gross earnings' of the relator as required by the statute, but on its gross receipts. Capital of a corporation which must first be invested before it begins to earn anything cannot be said to be a part of the earnings of such corporation merely because it is turned into cash and thus in one sense becomes a receipt of the corporation. Earnings do not include capital, but are the productions or outgrowth of capital. In some cases like the one now under consideration the capital must be supplemented by labor and such other expenditures as may be incidental to the development of the manufactured product from the raw material. Such incidental expenditures are doubtless part of the 'gross earnings.' If the coal in question had been used under the boilers for developing heat, such coal like labor would be merely an incidental expenditure in the process of converting the capital from one form into another, and should probably be included as a part of the 'gross earnings' of the relator. But the evidence is that the coal in question was not used for generating heat, but was of a different kind and was converted into gas. In fixing the 'gross earnings' of the relator there should, therefore, have been deducted from the gross receipts the cost of the raw material."

The case of *People ex rel. Brooklyn Union Gas Co.* v. *Morgan*, supra, was affirmed by the New York court of appeals, and the legislature of the State of New York, intending to tax gas companies upon their "gross receipts" as distinguished from their "gross earnings," enacted a new statute (Laws of 1907, chapter 734) in which it defined the term "gross earnings" in the franchise tax law of the State affecting gas companies to mean "all receipts from the employment of capital *without deduction*." It is important here to observe that in *People ex*

*rel. New York C. & H. R. R. Co.* v. *Roberts,* 32 App. Div. 113, 52 N. Y. Supp. 859, before cited, the appellate division of the supreme court had some years before held that, without special legislative definition, "gross earnings" meant all receipts arising from or growing out of the employment of capital, and the legislature, in giving to the term "gross earnings" a meaning synonymous with "gross receipts," was compelled to provide that there should be no deduction of capital itself from the "gross receipts" in order to arrive at "gross earnings," and therefore added to what were substantially the words of the definition in *People ex rel. New York C. & H. R. R. Co.* v. *Roberts,* the all important words *without deduction.*

In *People ex rel. Winchester Lighting Co.* v. *Gaus,* 199 N. Y. 147, 92 N. E. 230, the amended statute came up for review, and the court sustained a tax upon "gross receipts" expressly upon the fact that the amendment indicated a clear legislative intent, but even in that case the court approached the construction of "gross earnings" of a concern manufacturing a commodity for sale with much difference; for in referring to the statute the opinion says, *"However the language offends against the normal concept,* we must regard the law as classifying with earnings, for the purpose of the tax, all receipts from the use of capital. That is what the legislature has done."

In this case, then, there can be no doubt that under paragraph 5 of section 6 of the act of July 1, 1902, the appellee in rendering its statement of its "gross earnings" to the assessor of the District was entitled to deduct from its "gross receipts" its expenditures for the raw materials actually used in the manufacture of gas, and which had been purchased with money taken from its capital.

The court does not, upon the pleadings in this case, decide whether all the materials included in the list enumerated in the appellee's declaration are in fact raw materials which are actually converted into the manufactured product, gas. The declaration alleges that they are used in the manufacture of gas and were paid for out of capital. The demurrer admits those facts. It is therefore unnecessary to state what the ruling

would have been as to generator fuel, boiler fuel, and such items, if that question had been raised by a plea.

Finding no error in the ruling of the court below, the judg-. ment is affirmed, with costs above and below.    *Affirmed.*